SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-03-0199-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR2000-090114 |
| FABIO EVELIO GOMEZ, | ) |
| | ) |
| Appellant. | ) **O P I N I O N** |
| | ) |
| _____ | ) |

Appeal from the Superior Court of Maricopa County
The Honorable James H. Keppel

**CONVICTIONS AND SEXUAL ASSAULT SENTENCE AFFIRMED, CAPITAL AND
KIDNAPPING SENTENCES VACATED, REMANDED FOR FURTHER SENTENCING
PROCEEDINGS**

---

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel
          Capital Litigation Section
          Jim D. Nielsen, Assistant Attorney General
Attorneys for the State of Arizona

JAMES J. HAAS, MARICOPA COUNTY PUBLIC DEFENDER             Phoenix
     By   Terry J. Adams, Deputy Public Defender
          Susan L. Corey, Deputy Public Defender
Attorneys for Fabio Evelio Gomez

---

**H U R W I T Z**, Justice

¶1     Fabio Evelio Gomez was convicted of kidnapping, sexual
assault, and first degree murder.  Gomez received a death
sentence for first degree murder and an automatic notice of
appeal was filed pursuant to Arizona Rule of Criminal Procedure
31.2(b).  This Court has jurisdiction under Article 6, Section

5(3), of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") § 13-4031 (2001).

I.

¶2      Joan Morane lived in the Chandler Park Tower Apartments in Chandler, Arizona.  On December 2, 1999, a friend stopped by Joan's apartment after work.  The door of the apartment was unlocked and various items inside were in disarray.

¶3      Gomez lived across the landing from Joan.  Shortly after 5:00 p.m., a resident of the apartment complex heard a woman screaming "No!" from Gomez's bathroom and called 911.  Chandler police officers responded to the call.

¶4      When the officers arrived, Joan's friend informed them that Joan was missing.  After looking through Joan's apartment, the officers departed.[1]  Joan's friend remained and attempted to talk to neighbors about the 911 call.  Gomez initially did not respond to knocks on his door, but later emerged, denying that he had seen Joan or heard any screaming.  Shortly thereafter, Gomez left his apartment to pick up his live-in girlfriend.

¶5      Joan still had not returned, so her friend telephoned Joan's ex-husband, who arrived at the complex at about 6:00 p.m.

---

[1]      The neighbor who had made the 911 call left the complex shortly after the officers arrived.  The officers therefore apparently did not know which apartment had been the scene of the alleged screaming and did not go to Gomez's apartment.

The ex-husband found two red buttons outside of Gomez's apartment door, and Chandler police were again summoned. An officer returned, collected the buttons, and left the complex at approximately 8:00 p.m.

¶6 Gomez and his girlfriend returned at about the same time as the officers were leaving. The girlfriend saw blood in their apartment and complained to Gomez. Gomez told her that earlier that day he had gone outside to smoke, leaving the door open, and that a cat had come in and scratched their baby. Gomez said that he bludgeoned the cat to death in the bathroom and threw it into a dumpster at the complex. The girlfriend went down to look in the dumpster but saw no cat; on returning to the apartment she discovered more blood.

¶7 Chandler police officers came back to the complex later that evening and briefly questioned Gomez from outside of his apartment. Gomez again claimed to know nothing about Joan's disappearance or sounds of screaming coming from his apartment. The police returned to the complex several times during the early morning of December 3. On one of these occasions, an officer saw Gomez on the staircase carrying a deflated yellow raft to his girlfriend's vehicle. Gomez again denied any knowledge of Joan's disappearance.

¶8 The officer returned about an hour later and looked into the girlfriend's car with his flashlight. After the

3

officer noted what appeared to be two small bloodstains on the yellow raft, he called for backup, went upstairs, and asked Gomez whether he and another officer could enter the apartment. Gomez agreed.

¶9      Once inside, one officer saw what appeared to be blood spots on the living room carpet.  He asked Gomez where the blood had come from; Gomez replied that his girlfriend had cut her foot.   The officers obtained Gomez's consent to search the apartment and noticed more blood on the bathroom walls.

¶10      In the bedroom, an officer found the girlfriend asleep, awakened her, and asked if she had cut her foot.  She replied she had not; the officer looked at her feet and found no injuries.  He then asked her about the blood in the living room, and she related Gomez's explanation about the cat.

¶11      The officers then asked Gomez what he had done with the cat.  Gomez said that he had put it in a garbage bag and thrown it into a dumpster at a nearby restaurant.   After radioing for a search of the restaurant dumpster, officers noticed more spots of what appeared to be blood in the bathroom and by the front door and found wet throw rugs hung up to dry in the bathroom.

¶12      A search of the restaurant dumpster proved futile. However, an officer subsequently saw what appeared to be dried blood on the front of a dumpster at the apartment complex.

4

Inside the dumpster, an officer found a blanket, a newspaper, and a woman's blouse, all with dried blood on them. A more thorough search revealed Joan's body, clad only in a red nightshirt missing buttons similar to the ones found outside Gomez's apartment.[2] In nearby dumpsters, the police found a pair of stained shorts, duct tape with blood on it and hairs attached to it, and bloodstained socks and washcloths.

¶13    Subsequent searches of Gomez's apartment revealed bloodstains on the walls and floor and a large bloodstain near the patio door that had been covered up with several towels and a pillow. A bloodstained comforter was found inside the washing machine. The police also found socks and towels in the apartment similar to the bloodstained items in the dumpsters. They also found a receipt dated December 1, 1999, showing the purchase of duct tape; the only duct tape found in the apartment was a small strip stuck to the carpet.

¶14    Vaginal swabs taken from Joan's body revealed the presence of semen. Subsequent DNA testing identified the semen

---

[2]    Joan's body was bruised extensively. She had bruises on her arms and wrists consistent with someone gripping her tightly. The bruises to her right hand and wrist were consistent with defensive wounds. Joan had numerous lacerations and contusions on her face and head. Her nose was broken and an abrasion at the back of her hairline was consistent with duct tape having been applied and then removed. Joan's skull was "extensively" fractured; the shattered bone fragments had torn her brain.

as Gomez's and the bloodstains in the apartment as Joan's. No cat blood was ever found in the apartment.

¶15 At trial, Gomez denied any knowledge of or involvement in Joan's disappearance and murder. He admitted to having sex with Joan but claimed it was consensual. He again claimed that the blood in his apartment was from a cat.

¶16 The jury returned verdicts finding Gomez guilty of first degree murder, kidnapping, and sexual assault.[3] Sentencing proceedings were commenced before the trial judge, but before sentence could be pronounced, the United States Supreme Court decided *Ring v. Arizona*, 536 U.S. 584 (2002) (*Ring II*), holding Arizona's capital sentencing scheme unconstitutional. The legislature then amended the capital sentencing statute and assigned to juries the responsibility of finding aggravating circumstances and determining whether a sentence of life imprisonment or death should be imposed. 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 3 (codified at A.R.S. § 13-703.01 (Supp. 2003)). The sentencing proceedings therefore began anew under the amended statutes before a new judge and a newly empanelled jury. Gomez represented himself during these

---

[3] As to the first degree murder conviction, six jurors found premeditation and six found felony murder. A jury need not be unanimous as to the theory of first degree murder as long as all agree that the murder was committed. *Schad v. Arizona*, 501 U.S. 624, 645 (1991); *State v. Tucker*, 205 Ariz. 157, 167 ¶ 51, 68 P.3d 110, 120 (2003).

6

proceedings with the assistance of advisory counsel.[4]  At the conclusion of the aggravation phase, the jury unanimously found that the murder was committed in a cruel and depraved manner but was not unanimous as to whether the murder was heinous.[5]  After hearing mitigation evidence in the penalty phase, the jury found death to be the appropriate sentence.  The superior court subsequently sentenced Gomez to death for the first degree murder and to aggravated sentences for the kidnapping and sexual assault, the non-capital sentences to run concurrently with each other and consecutively to the death sentence.

¶17        Gomez challenges his conviction for first degree murder and his sentences for all three of the offenses.  For the reasons below, we affirm Gomez's convictions but vacate his death sentence and the kidnapping sentence and remand for resentencing.

## II.

## A.

¶18        Gomez argues that the superior court erred in giving

---

[4]    Gomez relinquished his pro per status at the end of the trial and allowed advisory counsel to represent him and present the closing argument.

[5]    A.R.S. § 13-703(F)(6) (2001) lists as an aggravating circumstance that "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner."  Because the statute lists the three factors in the disjunctive, a finding of any one of the three establishes the (F)(6) aggravator.  *State v. Cromwell,* 211 Ariz. 181, 189 ¶ 43, 119 P.3d 448, 456 (2005).

the following jury instruction regarding premeditation:

> Premeditation means that a person acts with either the intention or the knowledge that he will kill another human being when such intention or knowledge preceded the killing by a length of time to permit reflection. Proof of actual reflection is not required, but an act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.

> It is this period of reflection, regardless of its length, which distinguishes first degree murder from intentional or knowing second degree murder.

The court gave this instruction both at the beginning and end of the trial. Gomez did not object on either occasion.

¶19    In *State v. Thompson,* we found the use of the phrase "proof of actual reflection is not required" to be error if given in a jury instruction "without further clarification." 204 Ariz. 471, 480 ¶ 34, 65 P.3d 420, 429 (2003). The State concedes that the instruction given in this case was erroneous in light of *Thompson,* but argues that reversal is not warranted because of Gomez's failure to object to the instruction.

¶20    We have emphasized that "rarely will an improperly given instruction justify reversal of a criminal conviction when no objection has been made in the trial court." *State v. Van Adams*, 194 Ariz. 408, 415 ¶ 17, 984 P.2d 16, 23 (1999) (internal quotation marks and citations omitted). In the absence of an objection to an instruction, we review for fundamental error. *State v. Hunter,* 142 Ariz. 88, 90, 688 P.2d 980, 982 (1984).

¶21    Error is fundamental if it "goes to the foundation of

8

[the defendant's] case, takes away a right that is essential to his defense, and is of such magnitude that he could not have received a fair trial." *State v. Henderson*, 210 Ariz. 561, 568 ¶ 24, 115 P.3d 601, 608 (2005). Reversal is required only if the defendant was actually prejudiced by the error. *Id.* at 567 ¶ 20, 115 P.3d at 607.

**¶22**    In arguing that any error was not fundamental, the State relies heavily on *Van Adams*. In that case, decided before *Thompson*, the defendant was charged with first degree murder; his defense was that he did not commit the homicide. *Van Adams*, 194 Ariz. at 415 ¶ 18, 984 P.2d at 23. Van Adams claimed on appeal that the superior court erred in failing to instruct the jury that actual reflection was needed for premeditation. *Id.* at 414 ¶ 16, 984 P.2d at 22. Because Van Adams failed to object to the jury instructions, however, we held that he was precluded from claiming anything but fundamental error. *Id.* at 415 ¶ 17, 984 P.2d at 23. The error in *Van Adams* was not fundamental because

> [a]ppellant's defense rested solely on his claim of total innocence or mistaken identity, rather than on an assertion that although he committed the murder, he did so mistakenly or without actual reflection. The premeditation instruction therefore neither removed a right from Appellant nor hindered his ability to raise total innocence or mistaken identity as his defense. If the trial court erred, the error did not take from defendant a right essential to his defense.

*Id.* at ¶ 18.

9

¶23     Like Van Adams, Gomez also presented a claim of total innocence.  In attempting to distinguish *Van Adams*, Gomez places primary reliance on *State v. Dann*, 205 Ariz. 557, 74 P.3d 231 (2003), decided after *Thompson*.  In *Dann*, the defendant was charged with three first degree murders, *id*. at 562 ¶ 1, 74 P.3d at 236, and defended on the grounds of total innocence, *id.* at 566 ¶ 19 n.3, 74 P.3d at 240 n.3.  The superior court gave a variant of the instruction disapproved in *Thompson*.  *Id.* at 565 ¶ 17, 74 P.3d at 239.

¶24     This Court found the instruction erroneous.  *Id.* Because Dann had objected to the jury instruction, it was analyzed for harmless error.  *Id.* at ¶ 18.  We concluded that the State had not demonstrated that the error was harmless beyond a reasonable doubt as to two of the murder verdicts because the evidence of premeditation was not overwhelming.  *Id.* at 566 ¶ 21, 74 P.3d at 240.

¶25     Claiming that the evidence of premeditation in this case also is not overwhelming, Gomez argues that *Dann* requires a new trial.  Gomez, however, ignores an important distinction between *Dann* and *Van Adams*.  In the latter case, because the defendant did not object to the allegedly erroneous jury instruction on premeditation, our review was for *fundamental error;* we found none because the defendant claimed total innocence.  In contrast, in *Dann*, in which a timely objection

10

was raised, this Court reviewed for *harmless error* and concluded that the State could not demonstrate that the erroneous instruction was harmless beyond a reasonable doubt. The two cases thus turn on the differing standards of review for harmless and fundamental error.

¶26 This Court recently explained those standards in *Henderson*:

> Reviewing courts consider alleged trial error under the harmless error standard when a defendant objects at trial and thereby preserves an issue for appeal. Harmless error review places the burden on the state to prove beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence.
>
> Fundamental error review, in contrast, applies when a defendant fails to object to alleged trial error. The scope of review for fundamental error is limited. A defendant who fails to object at trial forfeits the right to obtain appellate relief except in those rare cases that involve error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial. In addition, we place the burden of persuasion in fundamental error review on the defendant.

210 Ariz. at 567 ¶¶ 18-19, 115 P.3d at 607 (internal citations and quotation omitted).

¶27 *Van Adams* squarely holds that, when a defense rests solely on a claim of total innocence, an erroneous jury instruction on premeditation does not take away a right essential to the defense. 194 Ariz. at 415 ¶ 18, 984 P.2d at 23. Because Gomez's defense was of total innocence, any error

11

in the jury instruction therefore is not fundamental.

**B.**

¶28    Gomez requested and received a jury instruction on the lesser included offense of second degree murder. He also requested a manslaughter instruction, which the trial court refused. Citing *Beck v. Alabama*, 447 U.S. 625, 638 (1980), Gomez argues that this deprived him of due process.

State v. Anderson dealt with this very argument:

> Anderson next argues that the denial of an aggravated assault instruction deprived him of due process under the rule of *Beck v. Alabama*, 447 U.S. 625 (1980). *Beck* held unconstitutional an Alabama statute that prohibited a trial court from instructing the jury on any lesser included offense in a capital murder prosecution. The Supreme Court found that such a restriction might lead a jury to convict a defendant of capital murder, despite jurors' reasonable doubts, merely because the jurors thought the defendant was guilty of some crime and should therefore be punished. *Id.* at 642-43.
>
> The Supreme Court's subsequent opinion in *Schad v. Arizona*, 501 U.S. 624 (1991), shows that *Beck* is of no avail to Anderson. In *Schad,* the defendant argued that "the due process principles underlying *Beck* require that the jury in a capital case be instructed on every lesser included noncapital offense supported by the evidence." *Id.* at 646. The Court disagreed, noting that its concern in *Beck* was the statute's "all-or-nothing" nature. *Id.* Because the jury in *Schad* was given the option to convict the defendant of a lesser offense, second-degree murder, and rejected that option, the Supreme Court held that the trial court's refusal to instruct on robbery did not implicate the *Beck* rule. *Id.* at 647-48.

210 Ariz. 327, 344 ¶¶ 63-64, 111 P.3d 369, 386 (2005).

¶29    Here, as in *Anderson*, the superior court instructed on

12

the immediately lesser included offense, but refused to instruct on an additional lesser included offense. As in *Anderson*, because the jury found the defendant guilty of the highest offense, the *Beck* rule was not implicated, *id.* at ¶ 64, and the jury "'necessarily rejected all other lesser-included offenses.'" *State v. Vickers*, 159 Ariz. 532, 542, 768 P.2d 1177, 1187 (1989) (quoting *State v. White*, 144 Ariz. 245, 247, 697 P.2d 328, 330 (1985)).

¶30 Gomez also argues that the evidence supports a manslaughter instruction and one therefore should have been given as a matter of state law. "[A] defendant is 'entitled to an instruction on any theory reasonably supported by evidence.'" *Anderson*, 210 Ariz. at 343 ¶ 60, 111 P.3d at 385 (quoting *State v. LaGrand*, 152 Ariz. 483, 487, 733 P.2d 1066, 1070 (1987)). It "is fundamental error to omit such an instruction in a capital case when it is supported by the evidence . . . ." *State v. Krone*, 182 Ariz. 319, 323, 897 P.2d 621, 625 (1995).

¶31 Manslaughter is defined as "[c]ommitting second degree murder . . . upon a sudden quarrel or heat of passion resulting from adequate provocation by the victim." A.R.S. § 13-1103(A)(2) (2001). Gomez argues that the evidence could support a finding that the killing was caused by a sudden quarrel or heat of passion, citing both the testimony of the neighbor who heard yelling and the victim's extensive injuries.

13

¶32      Although a savage murder or evidence of an argument may be indicative of a sudden quarrel or heat of passion, under § 13-1103(A)(2) the sudden quarrel or heat of passion must *result from* adequate provocation by the victim. Adequate provocation is defined as "conduct or circumstances sufficient to deprive a reasonable person of self-control." A.R.S. § 13-1101(4) (2001). Gomez points to no evidence of such provocation. Even if Joan refused Gomez's sexual advances, such actions would not deprive a reasonable person of self-control and thus cannot rise to the level of adequate provocation. The evidence here did not support a manslaughter instruction and the court correctly refused to give one.

### III.

¶33      At sentencing the trial judge stated:

> I find in aggravation as to both Count 2 [kidnapping] and Count 4 [sexual assault] that the defendant inflicted much more force than that required to commit those respective offenses. I find further that he obstructed the criminal investigation by the Chandler Police Department by lying to the police about the circumstances of the blood occurring in his apartment, which basically hindered their investigation. I find that both aggravating circumstances are substantial aggravating circumstances and call for the maximum sentences as to Counts 2 and 4.

In addition, the jury specifically found that both the kidnapping and sexual assault were dangerous offenses.[6]

---

[6]      The jury was instructed pursuant to A.R.S. § 13-604(I) that dangerousness involves either "the intentional or knowing

14

**¶34** Gomez argues that the superior court violated the rule in *Blakely v. Washington*, 542 U.S. 296 (2004), by sentencing him to aggravated terms on these non-capital counts based upon factual findings neither made by the jury nor admitted by him. Because Gomez did not object to judicial fact-finding of these non-capital aggravators, we review only for fundamental error. *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

## A.

**¶35** Gomez received a sentence of twenty-one years for kidnapping, a class 2 felony. Because the jury found the kidnapping to be a dangerous offense, the superior court presumably sentenced Gomez pursuant to A.R.S. § 13-604(I) (2001),[7] which governs sentencing for a first conviction of a class 2 felony involving the use of a "dangerous instrument" or the "intentional or knowing infliction of serious physical injury." Under A.R.S. § 13-604(I), the presumptive sentence is ten and one-half years. The statute allows an aggravated maximum sentence of twenty-one years upon the finding of an aggravating circumstance pursuant to A.R.S. § 13-702(C) (2001).

_____

infliction of serious physical injury or the use or threatening exhibition of a dangerous instrument**."**

[7] As we have previously emphasized, trial judges should clearly identify the specific statute under which they are sentencing a criminal defendant in order to facilitate appellate review. *State v. Anderson,* 211 Ariz. 59, 61 ¶ 4 n.1, 116 P.3d 1219, 1221 n.1 (2005).

15

¶36    Neither of the two aggravating factors relied upon by the superior court in imposing the aggravated twenty-one year sentence was found by the jury or admitted by Gomez.[8]  The State nonetheless argues that *Blakely* was satisfied because the "more force than necessary" finding was inherent in the jury verdict.  *See State v. Martinez*, 210 Ariz. 578, 583 ¶ 16, 115 P.3d 618, 623 (2005) (finding no Sixth Amendment violation when one aggravating factor is *Blakely*-compliant and others are found by sentencing judge).[9]

¶37    The jury, however, was neither asked to determine how much force was necessary to accomplish the kidnapping nor to decide when that force was exerted.  We therefore cannot

---

[8]    Neither of the two factors is expressly mentioned in § 13-703(C).  The superior court apparently relied on the "catch-all" in former § 13-702(C)(18) ("Any other factor that the court deems appropriate to the ends of justice") in finding these aggravating circumstances.  Gomez does not object to the findings of these two aggravators on the ground that they are not specified in § 13-703(C) and we therefore do not address that issue.  *See State v. Glassel*, 211 Ariz. 33, 58 ¶ 103 n.18, 116 P.3d 1193, 1218 n.18 (2005) (declining to address this issue when not raised).

[9]    The State correctly does not contend that the jury's dangerousness finding establishes the § 13-702(C)(1) "serious physical injury" aggravator.  This circumstance cannot be used to aggravate a sentence when it has also "been utilized to enhance the range of punishment under § 13-604."  A.R.S. § 13-702(C)(1).  Nor does the State argue that the § 13-702(C)(2) aggravator (use of a dangerous instrument) has been established by the dangerousness finding.  *See id.* (providing that this aggravator is not applicable when utilized to enhance a range of punishment under § 13-604).  We thus need not consider whether the evidence in this case is sufficient to establish the use of a dangerous instrument.

16

conclude that this aggravating circumstance was inherent in the jury's verdict. Because Gomez's kidnapping sentence was aggravated on the basis of this factor, we find fundamental error and remand for resentencing. *See Henderson*, 210 Ariz. at 568 ¶¶ 25-26, 115 P.3d at 608 (finding *Blakely* error fundamental when defendant receives longer sentence than he would have received in absence of such error).

### B.

¶38 In contrast, we find no error in the sexual assault sentence of fourteen years. Sentencing for sexual assault is not governed by the general scheme in A.R.S. § 13-702(A)(1) governing class 2 felonies. Instead, A.R.S. § 13-1406(B) (2001) provides a presumptive sentence of seven years for sexual assault for a first offense; the potential penalty is fourteen years upon the finding of a single aggravator. A.R.S. § 13-1406(B). The jury finding of dangerousness established the § 13-702(C)(1) "serious physical injury" aggravating factor, and there thus was no *Blakely* error.[10]

### IV.

### A.

¶39 Gomez represented himself during the aggravation and penalty phases of the trial and elected to wear prison garb

---

[10] Because the dangerousness finding was not used to enhance the sentencing range for sexual assault, § 13-702(C)(1) does not prohibit its use as an aggravator.

throughout these phases. The superior court required Gomez to wear shackles in these proceedings, which were held before a jury. Gomez objected to the shackling and argues on appeal that the superior court erred in overruling that objection.

¶40      The United States Supreme Court has recently addressed this very issue in *Deck v. Missouri*, 125 S. Ct. 2007 (2005), holding that

> courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding. The constitutional requirement, however, is not absolute. It permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling. In doing so, it accommodates the important need to protect the courtroom and its occupants. But any such determination must be case specific; that is to say, it should reflect particular concerns, say special security needs or escape risks, related to the defendant on trial.

*Id.* at 2014-15.

¶41      In *Deck*, the defendant was visibly shackled during the sentencing phases of a capital murder case. *Id.* at 2010. The Court began by noting that "[t]he law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of special need." *Id.* During that phase, the Court noted, "a criminal defendant has a right to remain free of physical restraints that are visible to the jury . . . ." *Id.* at 2012. "[A]bsent a trial court determination . . . that [shackles] are

18

justified by a state interest specific to a particular trial," such as security concerns or risk of escape, the use of visible physical restraints is prohibited. *Id.*

¶42     *Deck* considered for the first time whether the general rule against shackling during the guilt phase should be extended to the sentencing phases of a capital proceeding held before a jury. The Court held that "[t]he considerations that militate against the routine use of visible shackles during the guilt phase of a criminal trial apply with like force to penalty proceedings in capital cases" because the decision between life and death is "no less important than the decision about guilt." *Id.* at 2014. The Court emphasized that "[t]he appearance of the offender during the penalty phase in shackles . . . almost inevitably implies to the jury, as a matter of common sense, that court authorities consider the offender a danger to the community" and that shackling "almost inevitably affects adversely the jury's perception of the character of the defendant." *Id.*

¶43     As in the case of guilt proceedings, the Court noted, the defendant's constitutional right to be free of shackles visible to the jury during capital sentencing proceedings "is not absolute." *Id.* at 2014. As he may during the guilt phase, a trial judge may order shackling in light of "special circumstances" during the sentencing proceedings. *Id.* at 2015.

But, as in the guilt phase, the Court stressed, such a determination must be "case specific" and reflect "particular concerns" relating to the defendant on trial. *Id.*

¶44 The United States Supreme Court found the visible shackling of Deck unconstitutional because the record contained no "formal or informal findings" indicating that the trial judge had required shackling in response to security or decorum concerns. *Id.* Nor could the Court conclude that this was "an exceptional case where the record itself makes clear that there are indisputably good reasons for shackling." *Id.* In the absence of such a record, the Court held that "the defendant need not demonstrate actual prejudice to make out a due process violation." *Id.* Rather, it is the state's burden to prove beyond a reasonable doubt that the shackling error did not contribute to the sentence. *Id.*

¶45 *Deck* was decided after the aggravation and penalty phases of the trial below. Newly declared constitutional rules, however, apply to criminal cases pending on direct review. *Griffith v. Kentucky*, 479 U.S. 314, 322 (1987). Given the timing of the *Deck* decision, the superior court understandably did not make any findings as to why Gomez should be shackled. Thus, our inquiry is whether this is an "exceptional case where the record itself makes clear that there are indisputably good reasons for shackling." *Deck*, 125 S. Ct. at 2015.

¶46    The State argues that the shackling was justified because Gomez was convicted of a capital crime, had numerous disciplinary reports while in jail, and was excluded from the courtroom briefly during a prior motion proceeding. The State, however, presented no such arguments below. Rather, it stood silent during the argument over Gomez's objection to shackling; the colloquy over the objection involved only Gomez, the trial judge, and a deputy sheriff. In any event, we are unable to conclude on this record that these justifications demonstrate "indisputably good reasons" for shackling.

¶47    As an initial matter, we note that Gomez's conviction for a capital crime cannot by itself justify shackling; *Deck* is precisely to the contrary. 125 S. Ct. at 2015. The superior court was not presented with any evidence of Gomez's disciplinary problems in jail until the rebuttal portion of the sentencing phase, some twenty days *after* the trial judge overruled Gomez's objection to the shackling; these incidents therefore played no role in the shackling decision. Nor can the fact that Gomez was earlier excluded from the courtroom justify shackling. That exclusion was the result of a refusal to cooperate with the court after a motion for change of judge was denied. The record contains no evidence of security concerns arising from that exclusion, nor is there any indication that the trial court relied upon that exclusion in its shackling

decision.

¶48     Rather, the record makes plain that the trial court allowed shackling not because of "case specific" security concerns about Gomez, but rather because shackling of *all* defendants in prison garb was required by jail policy.  The entire record with respect to the issue is as follows:

> MR. RAYNAK [advisory counsel]:  Your honor, I'm sorry. Can we just—Mr. Gomez had one issue that I think is a viable issue.  I know he's in his jail clothing, but he's also in chains.  If he was dressed out, he wouldn't be in chains.  So, I mean, I understand he chose to do the jail uniform.  That's not the issue, but, you know, he's walking up in front of the jury in chains.
>
> THE COURT:  Mr. Raynak, once again, if Mr. Gomez has an issue, he's going to present it to me himself. You're not representing him other than advisory counsel.
> So, Mr. Gomez, state your position.
>
> MR. GOMEZ:  Well, Your Honor, I agree with Mr. Raynak. I'm wearing this.
>
> THE COURT:  The jury's not going to see that.
>
> MR. GOMEZ:  I ain't going nowhere.  So, I would appreciate if I can ask for freedom.
>
> THE COURT:  Deputy, what's your position?
>
> THE DEPUTY:  Judge, typically if they're dressed out in stripes, the only thing I'm supposed to allow them is one hand free, but since he's pro per, I chose to get rid of the chains, the belly chains that he's normally supposed to wear and use the belt instead, but I left the leg irons on there because policy says they get one hand free if the judge asks for it, but I disregarded that and allowed him even more freedom.
>
> THE COURT:  All right.  Your request to have the

22

chains removed is denied, Mr. Gomez, but I will instruct the jury that they're not to consider that fact in any respect as part of their deliberations in this case.

¶49    *Deck* prohibits the routine shackling of defendants. A decision based solely on a general jail policy of shackling defendants who wear jail garb or exercise their constitutional right to represent themselves[11] is clearly not the kind of "case specific" determination of "particular concerns" that *Deck* requires. On the record before us, we must therefore conclude that the superior court erred in requiring Gomez to wear shackles.

¶50    The State argues that the shackles were not visible to the jury, and thus any error was harmless. The record, however, does not bear out this contention. While the trial judge did state at one point that "[t]he jury's not going to see that," he shortly thereafter offered to instruct the jury "not to consider" what he called "the chains." It is clear that Gomez moved about before the jury during the sentencing proceedings, and we are therefore unable to conclude that what the deputy sheriff referred to as "leg irons" and what both the judge and advisory counsel referred to as "chains" were not visible to the jury during the aggravation and sentencing phases.

---

[11]    *See Faretta v. California*, 422 U.S. 806 (1975) (holding that a defendant has the constitutional right to waive assistance of counsel and represent himself).

23

¶51     In the end, it is the state's burden to prove any shackling error harmless beyond a reasonable doubt. *Deck*, 125 S. Ct. at 2015. On this record, the State has not carried this burden. *Deck* therefore compels us to vacate the death sentence and remand for new sentencing proceedings.

**B.**

¶52     Because of our disposition of the shackling issue, it is unnecessary for us to address the remaining arguments raised by Gomez with respect to imposition of the death sentence. Despite Gomez's suggestion, we decline to address whether the superior court erred in allowing him to represent himself during the aggravation and penalty phases of the trial. Because Gomez allowed advisory counsel to give the closing argument in the penalty phase and was represented by counsel during arguments on his motion for a new trial and on appeal, he revoked his waiver of counsel. Should Gomez again attempt such a waiver on remand, the superior court can then assess his current competence to do so and determine whether the waiver is voluntary and intelligently made.

**V.**

¶53     For the foregoing reasons, we affirm Gomez's convictions for first degree murder, sexual assault, and kidnapping, and the aggravated sentence for sexual assault. We vacate the sentence of death for first degree murder and the

24

aggravated sentence for kidnapping, and remand for further proceedings consistent with this opinion.

_____
Andrew D. Hurwitz, Justice

CONCURRING:

_____
Ruth V. McGregor, Chief Justice

_____
Rebecca White Berch, Vice Chief Justice

_____
Michael D. Ryan, Justice

_____
W. Scott Bales, Justice