314 P.3d 1282

STATE of Arizona, Appellee,

v.

Zane Scott DICKINSON, Appellant.

No. 1 CA–CR12–0479.

Court of Appeals of Arizona, Division 1.

Dec. 17, 2013.

Arizona Attorney General's Office By Joseph T. Maziarz, Phoenix, for Appellee.

Mohave County Appellate Defender's Office By Jill L. Evans, Kingman for Appellant.

## OPINION

THUMMA, Judge.

¶ 1 Defendant Zane Dickinson appeals his conviction and sentence for attempted second degree murder. Dickinson argues fundamental, prejudicial error because a jury instruction allowed the jury to return a guilty verdict upon a showing that he "[k]new that his conduct would cause ... serious physical injury," rather than death. Concluding Dickinson has not met his burden to show prejudice from this fundamental error, his conviction and resulting sentence are affirmed.

## FACTS [1] AND PROCEDURAL HISTORY

¶ 2 For years, Dickinson and C.H., the victim, had been friends. In June 2011, they had a falling out when Dickinson failed to perform yard work he had agreed to do and refused to return tools to the victim. The two argued and Dickinson pulled a knife, but the victim fought back and was able to get away.

¶ 3 On July 2, 2011, while riding his bicycle, the victim saw Dickinson's truck at the house of a mutual friend. The victim then approached Dickinson, again asking for the

---

1. On appeal, this court considers the evidence in the light most favorable to sustaining the conviction and resolves all reasonable inferences against Dickinson. *State v. Karr,* 221 Ariz. 319, 320, ¶ 2, 212 P.3d 11, 12 (App.2008).

return of his tools and asking that Dickinson refund money to a customer for whom Dickinson had failed to perform work. According to the victim, as he walked by the truck, Dickinson "pulls out this ax, and he's coming at me." After a scuffle, Dickinson told the victim "he's going to kill me, and all this stuff, you know, and he cussed me and called me names. So I was just trying ... I got on my bike and rode away." Dickinson then apparently told the mutual friend "I'm going to run him over" and then left.

¶ 4 A short time later, while riding his bicycle near an alley, the victim saw Dickinson approaching in "a Ford Ranger, extended cab" truck. At trial, the victim testified:

I looked up and I seen him, and the last thing in my head is, he smiled. So next thing I know, he revved up his motor and he shot towards me. And I remember what happened. He hit the back of my bike, he had spun me all the way around about ten feet in the dirt. I landed on the dirt.

Still able to ride, the victim got back on his bicycle, "trying to get away." The victim thought he had lost Dickinson, but "all of a sudden I hear his motor revving up, and I look back and he's no more than maybe a foot from my bumper [of the bike], and he's laughing; so I realize what's going on." The victim again tried to get away, including riding toward a field, but "at the same time [Dickinson] turns his wheel and hit[s] my bike; and that's the last thing I remember, and I wake up in the hospital."

¶ 5 According to a witness, Dickinson "parked in this field, like he was waiting for [the victim], in his truck, with it running." The witness testified Dickinson ran the victim "down on his bicycle. [The victim] went up underneath the truck.... The bike collapsed, and [the victim] was drug underneath the truck." After running over the victim, Dickinson sped off. The victim sustained multiple injuries, including a concussion and head injuries resulting in 13 stitches, including across his eye; a broken ankle and his "funny bone was ripped out" from his elbow. The mutual friend testified that, after the incident, Dickinson returned and parked his truck at the friend's house, tossed the keys to the friend and said "that he had did it. That he done it."

¶ 6 The indictment charged Dickinson with attempted second degree murder, a class 2 dangerous felony, and other felony offenses. The State's theory of the case was that Dickinson tried to kill the victim. Dickinson did not testify and called no witnesses but asserted a defense of mistaken identity and claimed he had no involvement. Dickinson argued someone else ran over the victim and that he was being framed in an attempted insurance or prescription drug fraud. At no time did Dickinson assert that he hit the victim with his truck but did not intend to or try to kill the victim.

¶ 7 In its opening statement, the State repeatedly maintained that the evidence would show Dickinson "tried to kill [the victim]." In closing argument, the State repeatedly argued that Dickinson "was trying to kill [the victim]." Focusing on a comment Dickinson made in a recorded jail call that "I was defending myself really," the State argued Dickinson's acts were "not self-defense" and asked the jury to "[r]emember [Dickinson] said he was going to ... kill him." After referencing the attempted murder jury instruction quoted in the following paragraph, the State told the jury that the victim was lucky, the victim's injuries could have been much worse and Dickinson was "trying to kill" the victim.

¶ 8 Without objection, the court gave the following attempted second degree murder jury instruction (the italicized portion of which is at issue here):

The crime of attempted second degree murder has three elements. In order to find the defendant guilty of attempted second degree murder, you must find that, number one, the defendant intentionally did some act; and number two, the defendant believed such act was a step in the course of conduct planned to culminate in the commission of the crime of second degree murder; and number three, the defendant did so with the mental state required for the commission of the crime of second degree murder.

It is not necessary that you find that the defendant committed the crime of second degree murder; only that he attempted to commit such crime.

The crime of second degree murder has the following elements: Number one, the defendant caused the death of another person; and number two, the defendant either, A, did so intentionally or, B, knew that his conduct would cause death *or serious physical injury.*

After a three-day trial, the jury found Dickinson guilty as charged. Finding Dickinson had one prior historical felony conviction, the court sentenced him to an aggravated term of 12 years in prison on the attempted second degree murder conviction and to prison terms on the other counts.

¶ 9 Dickinson timely appealed his conviction for attempted second degree murder and the resulting sentence (but not the other convictions and sentences). This court has jurisdiction of Dickinson's appeal pursuant to Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes (A.R.S.) sections 12–120.21(A)(1), 13–4031 and – 4033(A)(1) (2013).[2]

## DISCUSSION

### I. Standard Of Review.

 ¶ 10 Dickinson challenges that portion of the attempted second degree murder jury instruction stating the jury could return a guilty verdict on an alternative showing that he "[knew] that his conduct would cause ... serious physical injury" but not death. At trial, Dickinson did not object to the instruction. Accordingly, this court's review on appeal is limited to fundamental error. Ariz. R.Crim. P. 21.3(c); *State v. Henderson*, 210 Ariz. 561, 567, ¶¶ 19–20, 115 P.3d 601, 607 (2005). " 'It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.' " *State v. Zaragoza*, 135 Ariz. 63, 66, 659 P.2d 22, 25 (1983) (quoting *Henderson v. Kibbe*, 431 U.S. 145,

154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977)); *accord State v. Gomez*, 211 Ariz. 494, 499, ¶ 20, 123 P.3d 1131, 1136 (2005); *State v. Van Adams*, 194 Ariz. 408, 415, ¶ 17, 984 P.2d 16, 23 (1999). "Accordingly, [Dickinson] 'bears the burden to establish that "(1) error exists, (2) the error is fundamental, and (3) the error caused him prejudice." ' " *State v. James*, 231 Ariz. 490, 493, ¶ 11, 297 P.3d 182, 185 (App.2013) (citations omitted).

### II. Fundamental Error.

 ¶ 11 Contrary to the jury instruction given in this case, attempted second degree murder can only be committed if the defendant intended to kill the victim or knew that the conduct would cause death. *State v. Ontiveros*, 206 Ariz. 539, 542, ¶ 14, 81 P.3d 330, 333 (App.2003) ("[T]here is no offense of attempted second-degree murder based on knowing merely that one's conduct will cause serious physical injury.").[3] Accordingly, the court erred in instructing the jury that it could convict Dickinson of attempted second degree murder on a finding that Dickinson knew his conduct would cause serious physical injury. *Id.*

 ¶ 12 Error is fundamental if a defendant shows "that the error complained of goes to the foundation of his case, takes away a right that is essential to his defense, and is of such magnitude that he could not have received a fair trial." *Henderson*, 210 Ariz. at 568, ¶ 24, 115 P.3d at 608. "This court has stated that instructing a jury on a non-existent theory of criminal liability is fundamental error." *James*, 231 Ariz. at 493, ¶ 13, 297 P.3d at 185 (citing *State v. Zinsmeyer*, 222 Ariz. 612, 623, ¶ 27, 218 P.3d 1069, 1080 (App.2009), *overruled on other grounds by State v. Bonfiglio*, 231 Ariz. 371, 295 P.3d 948 (2013); *Ontiveros*, 206 Ariz. at 542, ¶ 17, 81 P.3d at 333; *State v. Rutledge*, 197 Ariz. 389, 392 n. 7, ¶ 12, 4 P.3d 444, 447 n. 7 (App. 2000)). "Given the case-specific nature of the inquiry, however, [Dickinson] must show the error was fundamental in light of the facts

---

**2.** Absent material revisions after the relevant dates, statutes cited refer to the current version unless otherwise indicated.

**3.** The State argues *Ontiveros* should be overruled. The jury instruction was error under *Ontiveros,* and this court declines the State's request to revisit the legal issue decided in *Ontiveros.*

and circumstances of this case, recognizing that 'the same error may be fundamental in one case but not in another.'" *James,* 231 Ariz. at 493, ¶ 13, 297 P.3d at 185 (quoting *State v. Bible,* 175 Ariz. 549, 572, 858 P.2d 1152, 1175 (1993)). Because the instruction potentially "improperly relieved the State of its burden of proving an element of the offense," under the facts and circumstances of this case, the error complained of was fundamental because it goes to the foundation of the case. *State v. Kemper,* 229 Ariz. 105, 107, ¶¶ 5–6, 271 P.3d 484, 486 (App.2011) (citing *United States v. Gaudin,* 515 U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) and *Henderson,* 210 Ariz. at 568, ¶ 25, 115 P.3d at 608).

## III. Prejudice.

■■■■ ¶ 13 Fundamental error alone is not sufficient for reversal; Dickinson must show resulting prejudice. *Henderson,* 210 Ariz. at 568, ¶¶ 23–24, 26, 115 P.3d at 608. Prejudice is a fact-intensive inquiry, the outcome of which will "depend[ ] upon the type of error that occurred and the facts of a particular case." *James,* 231 Ariz. at 494, ¶ 15, 297 P.3d at 186 (quoting *Henderson,* 210 Ariz. at 568, ¶ 26, 115 P.3d at 608). Dickinson must affirmatively "prove prejudice" and may not rely upon "speculation" to carry his burden. *State v. Munninger,* 213 Ariz. 393, 397, ¶ 14, 142 P.3d 701, 705 (App. 2006). To prove prejudice, Dickinson must show that a reasonable, properly instructed jury "could have reached a different result." *James,* 231 Ariz. at 494, ¶ 15, 297 P.3d at 186. In determining whether a defendant has shown prejudice, the court considers the parties' theories, the evidence received at trial and the parties' arguments to the jury. *Id.*

■■■ ¶ 14 The State's theory was that Dickinson intended to kill the victim, not that he intended to cause serious physical injury or knew that his conduct would cause serious physical injury. The first two sentences of the State's opening statement made that plain: "Good afternoon. The evidence in this case will show you that [Dickinson] ... tried to kill" the victim. The State repeated in opening statement that the evidence would show that Dickinson "was trying to kill [the

victim]. Told him he was going to kill him up here, with the ax; then he went looking for him in his truck, and he didn't just try once, took him to the second time before he finally got him." These statements contain no suggestion that Dickinson simply was trying to cause the victim serious physical injury. Indeed, Dickinson does not contend that the State's theory was that he tried to cause serious physical injury to the victim.

¶ 15 Dickinson's defense was mistaken identity. More specifically, Dickinson's theory of the case was that he had nothing to do with the incident, that he was not the driver of the truck that ran over the victim and that he was being framed in an attempted insurance or prescription drug fraud. In pretrial filings, Dickinson disclosed alibi, mistaken identity, third party liability and general denial defenses, but did not assert any lack-of-intent defense. In opening statement, defense counsel stated bluntly: "Zane [Dickinson] didn't do this." The fact that Dickinson's defense did not implicate the erroneous jury instruction undercuts, rather than supports, his assertion that the instruction prejudiced him.

¶ 16 The trial evidence included testimony that Dickinson threatened the victim with an ax and told the victim he would kill him minutes before the incident. When the victim rode away on his bicycle, Dickinson said he was "going to run him over" and then drove after him in his truck. The victim testified that just before being run over, Dickinson "had that look in his face like, you know, he was going to kill me, man, he was going to kill me." A witness testified that Dickinson "proceeded to run [the victim] down on his bicycle. [The victim] went up underneath the truck.... The bike collapsed, and [the victim] was drug underneath the truck." The victim sustained multiple injuries, including head injuries, a concussion, a broken ankle and an injured elbow. This evidence is consistent with the State's theory that Dickinson intended to kill the victim, not just cause serious physical injury.

¶ 17 Dickinson points to statements he made in recorded jail calls that were received in evidence at trial, arguing "the jury may have found that [he] intended to cause seri-

ous physical injury rather than death." In one call, Dickinson stated "I don't know why I didn't just stop. I have insurance and everything." By itself, and without supporting evidence or argument (and none was provided at trial), this statement does not implicate the erroneous portion of the jury instruction.

¶ 18 In a separate recorded jail call, a caller said to Dickinson: "I heard from 'Big Mike,' according to him, he [the victim] was taunting you after you went by and you were coming back and you look like you was trying to scare him a little and you swerved off and he jumped right in front of you at the same time. That's what [Big] Mike said." In this statement, the caller (who did not see the incident) was describing a purported statement by Big Mike (who testified at trial he did not see the incident) about what Dickinson may have been "trying" to do. In response to the caller's statement, Dickinson said "I was defending myself really." Dickinson's response undercuts his primary defense of mistaken identity and is incongruous (purportedly defending himself by repeatedly driving a truck to run over the victim who was riding a bicycle). Moreover, at no time did Dickinson claim that he was involved but did not intend to kill the victim or knew that his conduct would cause serious physical injury but not death. In any event, Big Mike's trial testimony made plain that he did not witness the incident to begin with and could not have provided a firsthand account about what occurred.

¶ 19 Turning to closing arguments, Dickinson is correct that the State in its initial argument stated "when you look at the instruction, it's either he did this intentionally or that he knew his conduct would result in death or serious physical injury." Immediately continuing, however, the State argued:

> Now, [the victim]'s lucky. This could have been much worse; his injuries could have been much worse. You get spit through underneath a truck, could have been much worse. But [Dickinson] was trying to kill [the victim].

**4.** In some post-verdict notes to the superior court (called "kites"), Dickinson continued to assert

> Remember when he goes back—after he goes back to [a witness]'s house … what does [the witness] say? He says [Dickinson] comes back, throws him the keys, says I did it.

The State also mentioned the jail calls, but did so in arguing Dickinson "didn't have to go after" the victim, asserting "[t]his isn't a case of self-defense."

¶ 20 In closing, Dickinson's counsel argued that he had no involvement in the incident and the State's witnesses "concocted up and made up this story" given "bad blood" between Dickinson and those involved and attempted "insurance fraud" and prescription drug fraud by some witnesses. Regarding the jail calls, Dickinson's counsel asked, "who in their rational[ ] right mind," on hearing that the call would be recorded, "would then essentially confess? Because that's what the state's claiming." Dickinson attempted to negate the calls entirely, arguing the recordings "were chopped and spliced and put together" with "big gaps" and "without context of the entire conversation." At no time did this closing implicate Dickinson's mental state or the fundamentally erroneous jury instruction.[4]

¶ 21 In final closing, the State addressed the jail calls, first asking the jury to reject Dickinson's "context" argument: "The context is clear. The defendant was there. He ran the victim over. And he should have stopped. But then again, he was trying to kill him, so why would he stop?" After playing one of the recorded calls, the State continued to argue that Dickinson's actions were not in self-defense but, rather, were intended to kill the victim:

> This is not self-defense. [The victim] didn't jump out in front of him. Look at the acceleration marks, look at the photographs, consider the testimony of [one witness] with what the victim told you. He missed once. He—before that, they got in the argument. Remember he said he was going to [expletive deleted] kill him, followed in the same direction. After he missed once, he ran him over again. That's what the evidence shows.

witnesses were lying and that he had no involvement in the incident.

The State added "when you're trying to kill somebody and run them over, I mean it's—what do you expect?" The State never deviated from its consistent theme that Dickinson intended to kill the victim.[5]

¶ 22 The State's theory was that Dickinson intended to kill the victim; Dickinson's defense was mistaken identity and that he was not involved in the charged conduct in any respect. Neither of these competing views suggests that Dickinson intended to cause serious injury to the victim (as opposed to kill him), which is the fundamental error in the jury instructions. Based on the particular facts of this case—including the State's theory, Dickinson's defense, the evidence and the parties' arguments to the jury—Dickinson has failed to prove resulting prejudice from the fundamental error in the jury instruction. *Henderson,* 210 Ariz. at 568, ¶¶ 23–24, 26, 115 P.3d at 608. Accordingly, Dickinson's claim of fundamental, prejudicial error fails.

## CONCLUSION

¶ 23 Dickinson's conviction and sentence for attempted second degree murder are affirmed.

---

**5.** Dickinson argues that the victim's "injuries were not life threatening" and that this case does not involve "the use of a gun or knife." The injuries resulted in the victim receiving hospital treatment for head wounds, a concussion and a broken ankle after having been run over and dragged underneath a heavy extended cab truck.

Had Dickinson's defense been premised on a lack of intent or that he was merely trying to scare the victim, these arguments might have been more persuasive. On this record, given Dickinson's mistaken identity defense, they are not.