NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

---

IN RE DEPENDENCY AS TO A.J.

Nos. 1 CA-SA 25-0142
1 CA-JV 25-0097
(Consolidated)

---

FILED 11-05-2025

---

Special Action from the Superior Court in La Paz County
No. S1500JD202500001
The Honorable Marcus A. Kelley, Judge

**RELIEF DENIED**

---

COUNSEL

Carr Law Office, PLLC, Kingman
By Sandra Carr
*Counsel for Petitioner*

Arizona Attorney General's Office, Tucson
By Dawn Rachelle Williams
*Counsel for Appellee DCS*

Gerich Law Offices, Bullhead City
By Ashley Gerich
*Counsel for Appellee Child*

---

## MEMORANDUM DECISION

Chief Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Cynthia J. Bailey and Judge Andrew M. Jacobs joined.

---

H O W E, Judge:

¶1        Jasmine J. ("Mother") appeals from the juvenile court's order adjudicating her child, A.J., dependent as to her. For the following reasons, we deny relief.

### FACTS AND PROCEDURAL BACKGROUND

¶2        In January 2025, DCS received a report from police alleging that Mother "was displaying behaviors closely related to paranoia and having hallucinations." The report alleged that Mother "stat[ed] that she was being followed by someone and was gang raped . . . [a]nd she was also concerned [. . . that] her son and [she] were being poisoned." DCS took A.J. into its custody and petitioned for dependency alleging neglect due to Mother's "unmanaged mental illness" specifically "schizophrenia or a similar condition."

¶3        Several individuals testified at the dependency trial, including Quartzsite Police Officers Salcedo and Cabrera. Officer Salcedo testified that Mother called police to her campsite in January 2025. After they arrived, Mother told him that "someone had tried to break into her vehicle," "she was gang raped," and "she believed her and [A.J.] were being poisoned." The officer explained that he believed Mother hallucinated because she had pointed to someone and stated "[h]e's right there" when no one was "there." He also affirmed that Mother "made several statements" that "there are serial killers" and that those killers were "a desert storm operation or operative." Officer Salcedo also testified that he had contacted Mother approximately three times before the January 2025 incident and, on one occasion, saw both Mother and A.J. in their car at an RV park "known for drug use and drug trafficking." Officer Salcedo added that A.J. seemed "unfed," "admitted that he [had not eaten] and he had no food," "had dirt on his clothing," and "some body odor." The court also reviewed and admitted Officer Salcedo's police report and body camera footage.

¶4        Mother also testified at trial, explaining that she had undergone treatment for PTSD and anxiety. She claimed that, while living in Quartzsite she put a note "in a plastic bag of cheese with needles in it" and left it on the ground by the Veterans of Foreign Wars office, "hoping the Freemasons would find the note and come help [her]." She explained that "people around the country that have save[d her] life multiple times, they will come, check on [her]" so she placed the note and bag "in case there might just be [some]one somewhere around that might hear those words and . . . shield [her]." Further she professed that "everybody's a sovereign citizen in the United States because we are under civil unrest." Finally, she testified that, before she had children, she "participated in eating raw mushrooms out of the ground" that "probably" got her high, despite claiming in her substance abuse assessment that she never used drugs.

¶5        A.J.'s aunt, who lived in North Carolina near A.J.'s maternal grandmother ("Grandmother"), also testified at trial. She explained that Grandmother had legal guardianship over Mother's older son, I.J.[1] after Mother "left the state in the middle of the night when there was a scheduled visit with the North Carolina Department of Child Safety . . . the following morning," leaving I.J. behind. She also testified that I.J. had told her that Mother "tried to give him mushrooms" that were "grinded up." Additionally, she testified that Mother exhibited "extreme paranoia," affecting A.J.; that Mother believed panthers were stalking her and A.J.; and that she once saw a prescription medication in Mother's name that she believed was intended to treat a mental health disorder.

¶6        A psychologist testified that DCS requested an assessment of Mother, but that she had twice failed to attend her appointments. Drug tests admitted at trial revealed that Mother tested positive for opiates, codeine, and morphine and that her creatine levels were repeatedly "abnormal," which a doctor and medical toxicologist testified may indicate diluted urine. A drug test of A.J.'s hair after he was taken into DCS custody was positive for methamphetamine.

¶7        The court found A.J. dependent as to Mother, ruling that her testimony lacked credibility and that she "appeared mentally unstable" in both the body camera footage and "on the witness stand in trial." The court noted a variety of other evidence supporting its ruling, including A.J.'s aunt's credible testimony and Mother's failure to attend the DCS's requested psychological evaluation. The court also found sufficient evidence of substance-abuse allegations, relying on Mother's own

---

[1] Parental rights to I.J. are not part of this appeal.

testimony, her urinary analysis results, and A.J.'s positive methamphetamine result.

**¶8**        Mother appealed. This Court converted her appeal to a special action and accepted jurisdiction under Arizona Rule of Procedure for Special Actions 12(b)(5)-(6) and Ariz. Ct. App., Div. 1, Admin. Ord. 2024-12. [2]

## DISCUSSION

**¶9**        A dependent child is one who lacks "proper and effective parental care and control," or "has no parent or guardian willing to exercise or capable of exercising such care and control." A.R.S. § 8-201(15)(a)(i). The primary concern in a dependency adjudication is the child's best interest. *Joelle M. v. Dep't of Child Safety*, 245 Ariz. 525, 527 ¶ 10 (App. 2018). This Court reviews the superior court's dependency order for an abuse of discretion, *Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 50 ¶ 13 (App. 2016), and accepts its findings of fact unless clearly erroneous, *Michael M. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 230, 233 ¶ 10 (App. 2007). We will affirm a finding of dependency unless no reasonable evidence supports it. *Joelle M.*, 245 Ariz. at 527 ¶ 9.

**¶10**        Mother argues that the court erred in adjudicating A.J. dependent because (1) "the record does not establish that [Mother] was incapable of providing [A.J.] with effective parental care and control," (2) she "was deprived of a fair trial when the state failed to disclose that . . . Officer Eliana Cabrera is on the *Brady* list," *see generally Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that the State must disclose material evidence favorable to the accused), and (3) "[t]he government deprived Mother of a fair trial when it engaged in a pattern of misconduct, ambush and bad faith."

---

[2] This Court invited the parties to "include argument regarding the application of *In re Dependency as to G.K.*, 258 Ariz. 323 (App. 2024) to this matter" in their briefing. In *G.K.*, this Court held that an appeal from an order reaffirming dependency was moot following a subsequent, statutorily required, hearing and order. *Id.* at 324 ¶ 1. Neither party argues this matter is moot, nor have they supplemented the record with evidence of a subsequent report and review hearing. Thus, we exercise our discretion to consider this special action. *See Cardoso v. Soldo*, 230 Ariz. 614, 617 ¶ 5 (App. 2012).

¶11 The superior court did not err in finding A.J. dependent as to Mother. Sufficient evidence, including Mother's testimony, Officer Salcedo's testimony, A.J.'s aunt's testimony, and the drug testing, supported the finding of dependency. *Supra* ¶¶ 3–6; *see* A.R.S. § 8-201(15)(a)(i) (defining "[d]ependant child"). The superior court "is in the best position to weigh evidence and assess witness credibility" and we will not reweigh the evidence on appeal. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3 ¶ 9 (2016).

¶12 Mother claims that she "was deprived of a fair trial when the state failed to disclose that . . . Officer Eliana Cabrera is on the *Brady* list." Generally, in criminal proceedings, *Brady* requires the State to disclose material evidence useful to the defense. 373 U.S. at 87; *accord Foor v. Smith*, 243 Ariz. 594, 597 ¶ 10 (App. 2018). Prosecutorial agencies keep "list[s] of officers with potential violations discoverable under *Brady*" often called *Brady* lists. *Foor,* 243 Ariz. at 597 ¶ 11. Mother relies on *Foor* to claim that, despite not being a criminal proceeding, *Brady* should apply wherever "the state imposes its police power to deprive a person of her rights." She argues that because the State did not disclose that Officer Carbrera is on a *Brady* list, the trial was not fair and "[t]his Court should vacate the finding of dependency and remand for a new trial." But *Foor* recognizes that, regardless whether *Brady* applies, "information is material 'only if there is a reasonable probability . . . the result would have been different.'" *Foor*, 243 Ariz. at 599 ¶ 20 (quoting *United States v. Bagley*, 473 U.S. 667, 681–83 (1985)). In *Foor*, the potential *Brady* information was a testifying officer's inclusion on a *Brady* list which—as Mother acknowledges—this Court ultimately found immaterial because the superior court's findings were "thoroughly established" through other testimony and evidence. *Foor*, 243 Ariz. at 596, 599, 600 ¶¶ 5, 19, 22.

¶13 Similarly here, Officer Cabrera's testimony was immaterial because Officer Salcedo's testimony, as well as the testimony from other witnesses and other evidence admitted at trial was sufficient for the court to adjudicate A.J. dependent as to Mother. *See Joelle M.*, 245 Ariz. at 527 ¶ 9 ("This court affirms a finding of dependency unless it is supported by no reasonable evidence."). As DCS notes, the court's findings primarily rely on evidence *not* provided by Officer Cabrera. Thus, any potential *Brady* issue is immaterial. And as Mother acknowledges, she impeached Officer Cabrera on cross-examination by noting discrepancies between her testimony and the police reports and body worn camera footage. Although Mother claims "the impeachment of Cabrera *could* have been even stronger" had she known the officer was on the *Brady* list, she impeached her regardless. (Emphasis added.) She fails to show a reasonable

probability that the outcome would have been different with the knowledge of Officer Cabrera's inclusion on the *Brady* list. *See Bagley*, 473 U.S. at 682. Thus, the information is immaterial, and remand is unwarranted.

**¶14** Mother next claims that "[t]he government deprived [her] of a fair trial when it engaged in a pattern of misconduct, ambush and bad faith." She argues that the State interfered with her fundamental right to raise her child by "employing delay tactics" and "filing supplement[al] disclosure notice after supplemental disclosure notice and engage[d] in ambush tactics with its disclosure." "[W]e review allegations of due process violations on a case-by-case basis" de novo. *Dep't of Child Safety v. Carel G.*, ___ Ariz. ___, ___ ¶¶ 26, 28, 573 P.3d 1120, 1127 (App. 2025). That DCS's disclosures are "burdensome" does not mandate a finding that Mother's due process rights were violated. *Id.* at 1128 ¶¶ 28–29. Rather, due process requires "notice and the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 1127 ¶ 26 (cleaned up).

**¶15** On the first day of trial, Mother's counsel objected to adding days to trial. She claimed that she believed adding a second trial day was a delay tactic that would "just encourage[] everybody to slow things down to make sure that we have to use the second date." The court did not add time immediately, instead stating "let's try and avoid [setting additional trial dates]" and it would "like th[e] leeway" to "reassess things" at the end of the first day. Later in the day, after noting its concern with "the amount of time" left in trial, the court ordered another day, reasoning that "a child [] hangs in the balance and there's also [Mother's] parenting rights that hang in the balance as well." On the second day of trial, Mother's counsel raised concerns about having enough time to complete the trial but still noted that she objected to additional time. The court again attempted to avoid adding a day, waiting to rule on the issue until the end of the day and stating that it "was hoping we were going to be done today." At the end of the day, the court set a third day, noting that Mother had not yet testified and wished to do so. Ultimately, the court added time to the trial to protect Mother's rights and ensure that she had adequate opportunity to respond to DCS's claims and testify herself. *See id.* Extending the trial did not violate Mother's due process rights.

**¶16** Mother next argues that DCS's disclosures were untimely and designed to delay proceedings in violation of her due process rights. Following initial disclosure requirements,

> [u]nless the court orders otherwise, any relevant document [] received by or prepared by a party must be disclosed no later than 10 days after its receipt or preparation. If a party receives or prepares a document fewer than 10 days before a hearing, the party must disclose it as soon as practicable before the hearing.

Ariz. R.P. Juv. Ct. 315(c). Specifically, Mother challenges two pieces of DCS's disclosure filed April 9 and 10, shortly before the first day of trial on April 11. Mother claims that "though the coversheet for [DCS's] disclosure packet clearly reflects that it was prepared for submission on March 17," DCS did not disclose it at that time, and she received it barely before trial. After review of the disclosure, it includes documents dated both before and after March 17. The April 9 filing contains a date as late as March 29 and as early as February 12. The April 10 filing contains a date as late as April 7 and as early as February 26. This suggests that, although the March 17 date is mistaken, Mother's factual premise—that DCS's disclosure was late—is correct. *See* Ariz. R.P. Juv. Ct. 315(c).

**¶17** But regardless the timing, Mother's legal conclusion—that the lateness violated her constitutional rights—is not correct. She does not claim the disclosure prevented her from being "heard at a meaningful time and in a meaningful manner." *Carel G.*, 573 P.3d at 1127 ¶ 26. Her "due process rights 'to be present,' 'to participate,' and to testify" were upheld. *Brenda D. v. Dep't of Child Safety*, 243 Ariz. 437, 444 ¶ 23 (2018) (quoting *Christy A. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 299, 306 ¶¶ 22, 24 (App. 2007)). At trial her counsel acknowledged the delayed disclosure and still requested that the court move forward with trial, arguing that "[e]veryone should be absolutely prepared to complete their case today." Mother does not say how the late disclosures might have prejudiced her, instead suggesting they were designed to delay proceedings in violation of her constitutional rights. But the party asserting prejudice "'must affirmatively prove prejudice' and cannot merely 'rely upon speculation.'" *Brenda D.*, 243 Ariz. at 448 ¶ 38 (quoting *State v. Dickinson*, 233 Ariz. 527, 531 ¶ 13 (App. 2013)). Mother's failure to specify how the untimely disclosure prejudiced her case shows that the late disclosures did not violate her due process rights. *See id.*

**¶18** Mother acknowledges that "[n]ormally, a sanction for late disclosure might include preclusion of the disclosure or perhaps a continuance." *See* Ariz. R.P. Juv. Ct. 315(g) ("[T]he court may impose sanctions on a party who fails to disclose information in a timely manner. Sanctions may include granting a continuance, precluding evidence, or

entering any order the court deems appropriate.") But she argues neither preclusion nor a continuance would "help [her]." That the potential sanctions for a disclosure violation are not to Mother's liking does not mean such a violation becomes a due process concern.

**¶19** Mother also complains that DCS re-disclosed information already disclosed alongside new discovery. But excessive discovery is not a due process violation. *See Carel G.*, 573 P.3d at 1128 ¶ 27 (holding that excessive discovery, though frustrating, limits the risk of erroneously depriving a parent of information and is not a due process violation). True, DCS could have conducted its disclosure in a more convenient and organized manner. But Mother does not show that the disclosure prevented her from "having notice of adverse facts or limit[ing her] ability to defend" herself or "an adequate opportunity to present [her] factual and legal claims fully." *See id.* at 1127 ¶¶ 26, 28–29. Thus, she has not shown a violation of due process.

## CONCLUSION

**¶20** For the reasons above, we deny relief.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**: JR