IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

THE STATE OF ARIZONA,
*Appellee,*

*v.*

SERGIO FIERRO JR.,
*Appellant.*

No. CR-20-0435-PR
Filed September 27, 2022

Appeal from the Superior Court in Pima County
No. CR20182710001
The Honorable Deborah Bernini, Judge
**AFFIRMED**

Memorandum Decision of the Court of Appeals, Division Two
2 CA-CR-2019-0161
Filed September 30, 2020
**VACATED**

COUNSEL:

Mark Brnovich, Arizona Attorney General, Brunn (Beau) W. Roysden III, Solicitor General, Linley Wilson, Deputy Solicitor General/Section Chief of Criminal Appeals, Michael T. O'Toole, Assistant Attorney General, Criminal Appeals Section, Kathryn A. Damstra (argued), Assistant Attorney General, Criminal Appeals Section, Tucson, Attorneys for State of Arizona

Megan Page, Public Defender, Sarah L. Mayhew (argued), Pima County
Public Defender's Office, Tucson, Attorneys for Sergio Fierro Jr.

—————————————

JUSTICE BOLICK authored the Opinion of the Court, in which CHIEF
JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICE
BEENE joined. JUSTICES LOPEZ, MONTGOMERY, and KING dissented.

—————————————

JUSTICE BOLICK, Opinion of the Court:

¶1        In this case, we hold that the trial court committed
fundamental error by instructing a jury that a conviction for attempted
second degree murder may be based not only on intent to kill but on
recklessness or the defendant's knowledge that serious injury would result.
This same faulty instruction has been used repeatedly in prior cases. To put
an end to such erroneous instructions, we provide a standalone instruction
for attempted second degree murder. However, applying a fundamental
error analysis to the facts of this case, we conclude the defendant has failed
to demonstrate that the erroneous instruction prejudiced him. We therefore
affirm his conviction and sentence.

## BACKGROUND

¶2        We view the evidence in the light most favorable to sustaining
the jury's verdict and resolve all reasonable inferences against the
defendant. *State v. Bible*, 175 Ariz. 549, 595 (1993); *State v. Dickinson*, 233
Ariz. 527, 528 n.1 (App. 2013).

¶3        J.H. went to his friend D.F.'s home in 2018. Because D.F. was
not home, J.H. waited with D.F.'s brother, Sergio Fierro, in a nearby RV
trailer. While J.H. and Fierro were talking, Fierro began making "paranoid
statements," asking J.H. who he was "running with." When J.H. responded

with confusion, Fierro grabbed a six-inch drill bit and stabbed J.H.'s neck. Fierro then continued stabbing J.H. repeatedly.[1]

¶4    A friend of J.H.'s, P.P., then opened the door of the trailer and witnessed Fierro attacking J.H., who was beneath him. P.P. ran away from the trailer, but Fierro pursued him with the drill bit, ultimately stabbing P.P. in the face. Though seriously injured, J.H. gave chase and used a folding knife to distract Fierro, allowing P.P. to escape.

¶5    J.H. fled to a nearby mobile home, whose residents called the police. After an officer arrived and attended to J.H., Fierro approached them wielding the drill bit and a bottle of alcohol. The officer ordered Fierro to stop, but he refused to comply. The officer shot Fierro with a taser, incapacitating him. The officer then arrested Fierro. J.H. was hospitalized for a week for his wounds.

¶6    Fierro was charged with two counts of aggravated assault with a deadly weapon or dangerous instrument, two counts of aggravated assault causing temporary but substantial disfigurement, and one count of attempted second degree murder of J.H.

¶7    During his opening statement at Fierro's trial, the prosecutor repeatedly told the jury that to convict Fierro for attempted second degree murder, it would need to find that he intended to kill J.H. Then, in his closing argument, the prosecutor reiterated that to find Fierro guilty of attempted second degree murder, jurors must find that he intended to kill J.H. Fierro argued that he acted in self-defense and therefore was justified in his actions.

---

[1] The drill bit Fierro used to attack J.H. was a spade bit. It has a small, sharp, arrow-shaped tip, behind which are two larger flat cutting edges, so that if thrust beyond the tip it would gouge the victim. Behind the blade is a round shaft about four inches long that makes it possible to wield and thrust it as a weapon. We have attached a photo of the drill bit from the record as an appendix to this opinion.

¶8          The trial court instructed the jury as follows:

A person commits attempted second degree murder if, acting with the kind of culpability otherwise required for commission of the offense, such person:

1. intentionally engages in conduct which would constitute the offense if the attendant circumstances were as such person believes them to be; or

2. intentionally does or omits to do anything which, under the circumstances as such person believes them to be, is any step in a course of conduct planned to culminate in the commission of the offense.

The crime of second degree murder requires proof of the following:

1. The defendant intentionally caused the death of another person; or

2. The defendant caused the death of another person by conduct which he knew would cause death or serious physical injury; or

3. Under circumstances manifesting extreme indifference to human life, the defendant recklessly engaged in conduct which created a grave risk of death. The risk must be such that disregarding it was a gross deviation from what a reasonable person in the defendant's situation would have done.

Fierro's lawyer did not object to this instruction.

¶9          The trial court also instructed the jury that "after you have deliberated and determined the facts you may then find that some instructions no longer apply. You must then consider the instructions that

do apply together with the facts as you have determined them. Decide this case by applying these instructions to the facts which you find."

**¶10** The jury found Fierro guilty on all charges. The trial court sentenced him to concurrent terms of imprisonment for the aggravated assault convictions, the longest of which totaled 11.25 years, to be served consecutively with a 15.75-year prison term for the attempted second degree murder conviction.

**¶11** Fierro appealed, arguing for the first time that the trial court erred in instructing the jury on attempted second degree murder. The court of appeals held that the trial court's jury instruction allowing Fierro's conviction for attempted second degree murder with a mental state of recklessness or based on conduct he knew would result in serious physical injury constituted fundamental error. *State v. Fierro*, No. 2 CA-CR 2019-0161, 2020 WL 5820866, at *2 ¶ 8 (Ariz. App. Sept. 30, 2020) (mem. decision). However, the court also concluded that the erroneous instruction did not prejudice Fierro, and therefore, it affirmed his convictions and sentences. *Id.* at *3 ¶ 11.

**¶12** We granted review to provide guidance on the appropriate jury instruction for attempted second degree murder, a recurring matter of statewide importance, and to determine whether the erroneous jury instruction in this case prejudiced Fierro. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## I. JURY INSTRUCTION FOR ATTEMPTED SECOND DEGREE MURDER

**¶13** For many years, trial courts have repeatedly issued incorrect jury instructions on the charge of attempted second degree murder, suggesting it can be committed by reckless conduct or when a defendant knows that serious bodily harm would result. Our court of appeals recognized over a quarter-century ago that "in Arizona there is no offense of attempted reckless second degree murder." *State v. Curry*, 187 Ariz. 623, 627 (App. 1996). But erroneous instructions continued, owing to the confusion of statutes separately governing second degree murder and attempt.

5

**¶14** In *State v. Ontiveros*, 206 Ariz. 539, 540 ¶ 5 (App. 2003), the trial court incorrectly instructed on attempted second degree murder that the jury must determine:

1. The defendant intentionally committed an act; and

2. The act was a step in a course of conduct which the defendant planned or believed would cause the death *or serious physical injury of another person*.

(Emphasis added.)  The court of appeals noted the statutory definition of second degree murder encompasses a defendant who, without premeditation, knowingly engages in conduct that will cause death or serious bodily injury, and the conduct actually causes death.  *Id.* at 540–41 ¶ 7 (citing A.R.S. § 13-1104(A)(2) (2001)).  Attempt, by contrast, concerns a defendant who intentionally commits an act that is "any step in a course of conduct planned to culminate in commission of an offense."  *Id.* at 541 ¶ 9 (citing § 13-1001(A)(2) (2001)) (emphasis omitted).

**¶15** The trial court's instruction on attempted second degree murder was erroneous, the court of appeals reasoned, because it included actions that knowingly would lead to serious bodily injury.  *Id.* ¶¶ 10–11.  "Because the completed offense of second-degree murder requires the result of death, it is not enough . . . that a person knows that his conduct will cause 'serious physical injury.'  A person who does not intend or know that his conduct will cause death cannot be said to have taken action 'planned to culminate' in death."  *Id.* ¶ 10.

**¶16** Despite *Ontiveros*, trial courts, including the one here, have continued to give jury instructions that fail to limit the requisite mental state for attempted second degree murder to intent to kill.  *See, e.g.*, *Dickinson*, 233 Ariz. at 530 ¶ 10., 233 Ariz. 527 (App. 2013); *State v. Juarez-Orci*, 236 Ariz. 520, 523–524 ¶¶ 9–13 (App. 2015).  Indeed, the Revised Arizona Jury Instructions (Criminal) do not contain a separate instruction for attempted second degree murder.  Rather, they define "attempt" with reference to the particular crime involved.  RAJI 10.01.  Because second degree murder can only be committed when death results, the intent to cause serious physical

injury and reckless conduct language has sometimes been imported into instructions for attempted second degree murder, despite a RAJI "Use Note" to the contrary. *Id.* ("Attempted second degree murder requires proof that the defendant either intended to or knowingly attempted to cause the death of another . . . ."). Therefore, in an attempted second degree murder case, neither intent to cause serious physical injury or recklessness is enough. The defendant must have intended to kill. *Ontiveros*, 206 Ariz. at 541 ¶ 10.

**¶17** Here, the trial court recited the statutory language for second degree murder, including an attempt to cause serious physical injury or reckless conduct that created a grave risk of death. The State concedes the instruction was erroneous because the instruction stated that Fierro could be found guilty of attempted second degree murder without intending to kill.

**¶18** Addressing the first issue on which we granted review, both the State and Fierro agree that a new instruction is necessary, and both made constructive proposals. At oral argument, the State expressed no objection to Fierro's proposed jury instruction for attempted second degree murder, which we now adopt with some modification. The instruction, with alternative language supplied to fit the circumstances of a particular charge, is as follows:

> The crime of attempted second-degree murder requires proof that the defendant, intentionally but without premeditation:
>
> 1. [engaged in conduct that defendant intended or believed would result in the death of [another person] [unborn child] if the circumstances relating to the crime were as the defendant believed them to be]; [or]
>
> 2. [committed any act that was a step in a course of conduct that the defendant intended or believed would cause the death of [another person] [unborn child]]; [or]

3. [engaged in conduct intended to aid another person in intentionally or knowingly causing the death of [another person] [unborn child] in a manner that would make the defendant an accomplice had the other person succeeded in causing that death.]

¶19 We appreciate both parties' diligence in suggesting language to rectify an error that has persisted for too long. The language we approve today correctly reflects the statutory definition of attempted second degree murder, and trial courts should use this instruction in future cases.

## II. PREJUDICIAL ERROR

¶20 When a defendant fails to object to a jury instruction at trial, as occurred here, this Court "will not reverse unless the court committed error that was both fundamental and prejudicial." *State v. Escalante*, 245 Ariz. 135, 140 ¶ 12 (2018). As noted, the instruction constituted fundamental error, but Fierro must still demonstrate the error prejudiced him.

¶21 We discussed at length the applicable standards for determining prejudice only four years ago in a unanimous opinion in *Escalante*, and those standards control the outcome here. Fierro bears the burden of proving prejudice. *Id.* at 142 ¶ 21. Establishing prejudice requires a defendant to show, based on the unique facts of the case, that "the error was so egregious that he could not possibly have received a fair trial," or, as relevant here, that absent the error "a reasonable jury… *could have* reached a different [verdict]." *Id.* at 142 ¶ 21, 144 ¶ 29 (citation omitted). The "could have" standard requires a showing far greater than a metaphysical possibility and "necessarily excludes imaginative guesswork." *Id.* ¶ 31. The standard is not subjectively what this particular jury might have concluded, but is rather an objective inquiry, requiring Fierro to show "that without the error, a reasonable jury could have plausibly and intelligently returned a different verdict." *Id.* "A 'reasonable jury' is 'composed of persons of average intelligence,'" who use common sense in evaluating the evidence and applying the court's instructions. *Id.* (quoting *Citizens Utils. Co. v. Firemen's Ins.*, 73 Ariz. 299, 302 (1952)). Importantly, in reviewing whether a defendant has made the requisite

showing, "an appellate court should examine the entire record, including the parties' theories [of the case]." *Id.* Moreover, "the amount of error-free evidence supporting a guilty verdict is pertinent to that inquiry." *Id.* ¶ 34.

**¶22** The dissent effectively eschews our *Escalante* prejudice framework and instead applies a sort of "super-fundamental error" standard that comes close to a per se rule that an erroneous jury instruction necessarily prejudices a defendant. *Infra* ¶¶ 42, 59. Our courts have never applied such a rule. *See, e.g.*, *Dickinson*, 233 Ariz. at 530–31 ¶¶ 12–13 (finding no prejudice from fundamental error stemming from erroneous attempted second degree murder instruction when the defendant's defense did not implicate the instruction); *State v. Ruiz*, 236 Ariz. 317, 325 ¶¶ 26–28 (finding no prejudice when the incorrect instruction was not implicated by the evidence).

**¶23** The dissent makes its discontent with the *Escalante* prejudice framework clear in its treatment of *Dickinson*, which it cites for holding that instructional error that relieves the state of its burden of proving an element of the offense is fundamental. *Infra* ¶ 44. No one disputes the faulty instruction here constituted fundamental error. But the dissent overlooks the very next, crucial passage from *Dickinson*: "Fundamental error alone is not sufficient for reversal; [the defendant] must show resulting prejudice." 233 Ariz. at 531 ¶ 13. Unlike the dissent, *infra* ¶ 58 ("some errors are per se prejudicial"), short of an instructional error "so egregious that a defendant could not possibly have received a fair trial," *see Escalante*, 245 Ariz. at 141 ¶ 20, we are not prepared to jettison the requirement that the defendant show that an error actually prejudiced him in order to vacate his conviction.

**¶24** Given the defendant's heavy burden to prove prejudice, it "is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *State v. Zaragoza*, 135 Ariz. 63, 66 (1983) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). Here, the error-free evidence, combined with Fierro's defense theory and the State's theory of the case, refutes the existence of prejudice.

¶25     An erroneous jury instruction could lead an objective, reasonable jury to reach a different verdict if the error relates to the defense against the charge. *See Escalante*, 245 Ariz. at 140 ¶ 12, 145–46 ¶¶ 40–42; *Juarez-Ocri*, 236 Ariz. at 526 ¶ 22. The defense here was unaffected by the faulty instruction. The evidence did not show, and Fierro did not argue, that he intended to cause serious physical injury short of death. Had this been the case, instructing the jury that this intent constituted attempted second degree murder would have prejudiced him. But Fierro's sole defense was that he was engaged in self-defense: that he and J.H. were struggling for a weapon and that Fierro was defending himself against the attack. Because simply trying to protect himself is quite distinct from intending to cause serious bodily injury, that defense was unaffected by the error in the jury instruction. Indeed, given that self-defense is a justification defense, had the jury believed Fierro's version of events, it would have acquitted him even considering the incorrect instruction. A.R.S. § 13-205 ("Justification defenses describe conduct that, if not justified, would constitute an offense but, if justified, does not constitute criminal or wrongful conduct.").

¶26     Self-defense and an intent to cause serious bodily harm are distinct concepts; attempting to prove the first does not lend support to the second. Self-defense involves actions and circumstances that justify the threat or use of force "when and to the extent a reasonable person would believe that physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful physical force." A.R.S. § 13-404(A). The defendant's subjective intent is immaterial; rather, the defense is determined based on these statutory "objective standards." *See State v. Carson*, 243 Ariz. 463, 465 ¶ 9 (2018). By contrast, attempted second degree murder requires proof of a specific, subjective mens rea. A.R.S. §§ 13-1104(a)(2) (second degree murder), -1001(A)(2) (attempt).

¶27     By arguing self-defense, Fierro did not put his mens rea at issue. Nonetheless, Fierro now attempts to conflate self-defense with specific intent, which he claims is implicit in his testimony and his attorney's argument to the jury. Fierro and the dissent (*infra* ¶ 48) place great weight on Fierro's testimony that he was "just trying to get him away from me," but the context indicates that testimony was directed to his attack

on P.P., not J.H., the victim of the attempted second degree murder. Indeed, Fierro straddled J.H. on the floor of the trailer while repeatedly stabbing him. Fierro testified that he left J.H. to chase P.P. because "he had already passed, you know, had already passed. I didn't see [J.H.] trying to hurt me no more." The dissent suggests that statement implied Fierro intended to seriously injure but not kill J.H., but the statement on its face indicates that Fierro thought he had killed J.H., and we "resolve all reasonable inferences against the defendant" on appeal. *Bible*, 175 Ariz. 549 at 595.

¶28 The dissent suggests that we "misconstrue[] the jury's rejection of Fierro's self-defense claim as an implicit finding of his intent to kill." *Infra* ¶ 43. Not at all. Rather, self-defense was Fierro's sole defense, which if believed by the jury would have led to acquittal regardless of whether Fierro intended to kill or merely injure J.H. But self-defense does not suggest an intent to cause serious bodily harm that implicates the erroneous instruction. Fierro's post hoc efforts to convert his sole theory of defense into another, different defense are unavailing.

¶29 Of course, to determine whether Fierro met his burden to show prejudice, we examine not only what he and his lawyer presented at trial, but the evidence as a whole and the State's theory of the case. *Dickinson*, 233 Ariz. at 531 ¶ 13 ("In determining whether a defendant has shown prejudice, the court considers the parties' theories, the evidence received at trial and the parties' arguments to the jury."). As the State points out, even under the erroneous instruction here, the State was required to show not only that Fierro caused serious physical injury, but that this act was a "step in a course of conduct planned to culminate in commission of an offense." A.R.S. § 13-1001. The pertinent offense is second degree murder, which requires proof that a defendant "caused the death of another person." *See* § 13-1104(A). Logically, a jury could not find that the defendant took a step planned to culminate in second degree murder without intending the victim's death.[2]

---

[2] To the extent that this logic is disregarded in the court of appeals opinion in *Juarez-Orci*, 236 Ariz. at 520 ¶ 14, we disavow that reasoning. *See also infra* ¶ 54 (distinguishing *Juarez-Orci*).

**¶30**        By contrast, an attempt based on intent to inflict serious injury would constitute aggravated assault.  Attempted second degree murder cannot be committed based on the mens rea for aggravated assault.  It can only be committed if the defendant intended to kill but failed.  The erroneous instruction muddled this distinction, making it fundamentally erroneous, but the requisite mens rea for attempted murder remained a necessary element for conviction, which the prosecutor recognized and argued to the jury, rendering the error non-prejudicial under the facts of this case.

**¶31**        The State also did nothing to exploit the erroneous instruction.  *Contrast, e.g.*, *Ontiveros*, 206 Ariz. at 543 ¶ 19 (finding the state exacerbated the prejudicial nature of the fundamentally erroneous instruction by arguing the jury could convict on attempted second degree murder based on physical injury or death during closing arguments).  To the contrary, the State's theory of the case and articulation of what it had to prove to obtain a conviction were consistent and unequivocal:  Fierro intended to kill J.H.

**¶32**        Fierro points to the State's description in its closing argument of the intent to kill as a "trickier question," suggesting the State implicitly acknowledged that Fierro could have been acting in self-defense.  Read in context, rather than plucked out of a lengthy closing argument, it is obvious that by "trickier," the State meant it presented a more complex fact determination than the other charged crimes.  The prosecutor argued:

> Attempted second-degree murder is a trick[i]er question. And it's one that you should take more seriously. It's one that you should be really thoughtful about in this case. *Because it requires you to come to a conclusion that the State has proven beyond a reasonable doubt that Sergio's intent was to kill him*, not that his intent was to stab him, not that his intent was to injure him, that *his intent was to kill him, to cause the result of his death.* That's pretty serious. It's a pretty serious allegation and crime to be throwing around when you don't have any obvious motive . . . . [Y]*ou have to come to the conclusion that he intended [J.H.'s] death when he was assaulting him . . . .*  And the first stab

gets him in the neck, also an important fact when trying to decide hey, what is he trying to do in there? What is he trying to do in there in the RV? He gets him in the neck. Guy starts bleeding immediately. Okay. [J.H. is] bleeding from the very first stab. And what is it that Sergio does next? Well, stabs him again, and again, and again, and he keeps trying to stab him . . . . Also important, why did Sergio stop? Why did Sergio stop the attack? Did he say oh, enough, mission accomplished? No. He stopped the attack because [P.P.] sticks his head in. And he decides to go chase [P.P.] . . . . He was there to finish him off. He was there to finish the job. And his behavior at that moment shines light back to what was he trying to do in that RV. His behavior at that second address shows you what his intent was in that RV and that was to kill [J.H.]. And that's why he's guilty of attempted murder . . . *What he was doing was he was assaulting him but he did so with the intent to murder him.* And because of that he's guilty of all charges.

(Emphasis added.)

**¶33**      The State was unequivocal throughout the trial that it had to demonstrate Fierro's intent to kill—and it was equally emphatic that the evidence could yield no other conclusion.  To be sure, a prosecutor's accurate statement of the law cannot correct a court's erroneous statement. *Taylor v. Kentucky*, 436 U.S. 478, 489 (1978).  But it can ameliorate it, such that it may be exceedingly difficult for the defense to prove prejudice under fundamental error review.  *See, e.g., State v. Bruggeman*, 161 Ariz. 508, 510 (App. 1989) (concluding the "error was not fatal" after determining "the final arguments . . . clarified any possible misunderstanding" (internal citations omitted)); *State v. Johnson*, 205 Ariz. 413, 417 ¶ 11 (App. 2003) (finding an erroneous instruction "in conjunction with the closing arguments of counsel" warranted reversal); *Dickinson*, 233 Ariz. at 533 ¶ 22 (holding that no prejudice occurred in part because the prosecutor consistently emphasized the jury had to find an intent to kill); *cf. Ontiveros*, 206 Ariz. at 543 ¶ 19 (emphasizing the State repeatedly suggested the defendant acted with the intent to cause serious physical injury *or* death).

¶34 The State's unvarying theory of the case here matters greatly. The prosecutor stated no less than ten times—in both its opening statement and closing argument—that it had to, would, and did prove Fierro's intent to kill. The prosecutor said nothing to contradict or undermine his entirely accurate description of the State's burden and the requisite jury finding. Even though the court improperly instructed the jury, the prosecutor repeatedly made clear the jury had to find an intent to kill, and consistently directed the jury to evidence presented at trial that proved this element of the offense. Far from carrying his burden, Fierro fails to show prejudice.

¶35 All this makes especially pertinent the trial court's instruction to the jury that "after you have deliberated and determined the facts, you may then find that some instructions no longer apply. You must then consider the instructions that do apply together with the facts as you have determined them." We can presume the jurors followed this instruction during their deliberations and disregarded the erroneous parts of the attempted second degree murder instruction because an intent to cause serious bodily harm simply does not apply to the charged offense; it neither matched the evidence nor the defense theory of the case, because the State's entire case relied upon proving an intent to kill. Under these circumstances, Fierro fails to meet his burden to prove the error prejudiced him.

¶36 The dissent (*infra* ¶ 45) cites *State v. Felix*, 237 Ariz. 280, 285 ¶ 16 (App. 2015), for the proposition that jurors are presumed to follow jury instructions. However, the court also observed that counsel's arguments may "cure or obviate instructional error or ambiguity." *Id.* ¶ 18. Fierro's defense, which failed to identify the question of intent to cause physical injury, combined with the State's unrelenting focus on Fierro's intent to kill, the correct language in the jury instruction that second degree murder must result in death, and the instruction to disregard inapplicable instructions, rendered the erroneous part of the jury instruction inapplicable. As we stated in *Escalante*, "the 'could have' standard is not easily satisfied. In keeping with *Henderson*'s pronouncement that appellate relief for fundamental error occurs in 'rare cases' and such error is 'curable only via a new trial,' the 'could have' inquiry necessarily excludes imaginative guesswork." 245 Ariz. at 144 ¶ 31. In short, Fierro's prejudice claim is

"imaginative guesswork," and falls short of meeting his burden of persuading us that he suffered prejudice.

¶37          Fierro argues that the result here should be guided by *Juarez-Orci*. There, the court of appeals reversed a conviction for attempted second degree murder based on an erroneous instruction like the one here. 236 Ariz. at 521 ¶ 9, 527 ¶ 23. The state's theory was that the defendant attempted to kill the victim. *Id.* at 526 ¶ 19. However, the evidence included testimony that the defendant had threatened to "beat up" the victim. *Id.* ¶ 20. The defense's theory was that the defendant merely intended to harm the victim, not kill her. *Id.* ¶ 21. The court concluded that "[t]he erroneous instruction therefore related directly to [the defendant's] defense," *id.* ¶ 22, and thus that the jury reasonably could have based its conviction on the incorrect instruction, *id.* ¶ 23. Here, for the reasons stated above, *supra* ¶¶ 21–34, Fierro can point to no evidence that similarly would have implicated his intent to inflict severe bodily injury. Hence the incorrect instruction was inapplicable.

¶38          We find this case more like *Dickinson*. In that case, also involving a similar erroneous jury instruction, the state's consistent theory was intent to kill, and its opening statement "contain[ed] no suggestion that [the defendant] was trying to cause the victim serious physical injury." 233 Ariz. at 531 ¶ 14. The defendant's theory was mistaken identity. *Id.* ¶ 15. The state presented evidence disproving that defense and also argued that the defendant did not act in self-defense. *Id.* at 532 ¶¶ 19, 21. Although the state paraphrased the erroneous instruction in its closing argument, *id.* ¶ 19, it "never deviated from its consistent theme that [the defendant] intended to kill the victim." *Id.* at 533 ¶ 21. The court of appeals accordingly held that the defendant had not proved prejudice and it sustained his conviction. *Id.* ¶¶ 22–23.

¶39          In this case, the State's theory, supported by the evidence presented at trial and its closing argument to the jury, was even more consistent and forceful. Unlike *Ontiveros*, in which a defendant charged with attempted second degree murder based on an intent to kill or cause serious physical injury "may have been convicted on a non-existent theory of liability," 206 Ariz. at 542 ¶ 17, here the State proceeded on a solitary

theory: that Fierro intended to kill his victim. The evidence did not support a conclusion that Fierro instead intended to inflict serious physical injury on J.H., and defense counsel did not argue otherwise to the jury. Indeed, it did not inject Fierro's mental state into the record at all.[3]

¶40        Based on the evidence, the nature of the charged offense, the State's theory of the case, and the defense presented to the jury, Fierro has not shown that the jury could have plausibly and intelligently convicted him of attempted second degree murder based on an intent to cause serious physical injury rather than a plan to cause J.H.'s death.

## CONCLUSION

¶41        We vacate the court of appeals' decision and affirm Fierro's conviction and sentence.

---

[3] The dissent (*infra* ¶ 59) cites a jury finding in response to interrogatories following the verdict that the defendant's conduct "involved the intentional or knowing infliction of serious physical injury" to support its belief that the jury may have been swayed by the erroneous instruction. Fierro did not argue this finding was meaningful. He likely refrained from bringing this finding to our attention because, as the dissent acknowledges, these interrogatories were for purposes of sentence enhancement, *see* A.R.S. §§ 13-702, -704, and are distinct from the process of finding guilt.

LOPEZ, J., joined by JUSTICES MONTGOMERY and KING, dissenting:

¶42        Before we deprive a citizen of liberty—even one who is likely to be lawfully convicted—should we not insist that a jury receive instructions that preclude the risk of a conviction based upon a non-existent crime and do not relieve the state of its constitutional burden to prove its case?  The majority's analysis and conclusion that, on this record, Fierro fails to establish prejudice because a reasonable jury could not have reached a different verdict absent the instructional error establishes an unwarranted and perilous tolerance for instructional error that relieves the State of its burden.  We respectfully dissent.

## I.

¶43        We concur in the majority's conclusion that the instructional error in this case is fundamental, *supra* ¶¶ 1, 20, and we embrace its newly-crafted attempted second degree murder instruction, *supra* ¶ 18, which should end twenty-five years of repeated instructional error in such cases. But we part ways with the majority's prejudice analysis because it (1) diminishes the import of instructional error relieving the State of its burden; (2) improperly emphasizes the strength of the State's case; (3) misconstrues the jury's rejection of Fierro's self-defense claim as an implicit finding of his intent to kill; (4) minimizes or overlooks critical record evidence concerning Fierro's intent; (5) overstates the remedial value of a prosecutor's correct statement of the law and misapprehends the significance of the jury instruction concerning instructions that "no longer apply"; and (6) relies upon readily distinguishable cases to justify a conclusion inconsistent with our courts' fundamental error prejudice jurisprudence.

¶44        The majority's analysis commences from a fundamentally faulty foundation because it disregards the unique significance of instructional error that relieves the State of its burden to prove its case.  *See, e.g.*, *State v. Dickinson*, 233 Ariz. 527, 531 ¶ 12 (App. 2013) (holding that an instruction that improperly relieves the state of its burden of proving an element of an offense is fundamental because it goes to the foundation of the case); *State v. Juarez-Orci*, 236 Ariz. 520, 526 ¶ 17 (App. 2015) (same).  As

we recently reiterated, because "[t]he Constitution requires the government prove to a jury every criminal charge beyond a reasonable doubt," the gravity of relieving the state of its burden to prove its case is manifest. *State v. Murray*, 250 Ariz. 543, 550 ¶ 22, 551 ¶ 27 (2021) (finding fundamental prejudicial error where, despite a proper jury instruction, the prosecutor misstated the reasonable doubt standard). *Murray* illustrates this Court's low tolerance for risk of conviction based upon a jury's erroneous apprehension of the law concerning the state's burden even when the jury has been properly instructed. *Id.* Here, the risk of unlawful conviction is of a greater order of magnitude because the jury instructions unambiguously permit conviction based on a non-existent crime with a lower burden of proof.

¶45 The majority drifts further from our prejudice jurisprudence as it focuses on the strength of the State's case and weakness of the defense rather than the record evidence that the defense placed Fierro's mental state—intent to kill—at issue in the case. *See, e.g., supra* ¶ 24 ("Here, the error-free evidence, combined with Fierro's defense theory and the State's theory of the case, refutes the existence of prejudice."). But "the sufficiency of the evidence is not the test of whether the fundamentally erroneous jury instruction prejudiced [a defendant]." *State v. Felix*, 237 Ariz. 280, 287 ¶ 22 (App. 2015). The prejudice test is also not "whether this court thinks another jury, properly instructed, will probably find [a defendant] guilty again. Rather, the test is whether a reasonable jury, properly instructed, *could have* found [a defendant] not guilty of attempted second-degree murder." *Id.* Here, by centering its analysis on the strength of the State's case and weakness of Fierro's self-defense claim, the majority strays from the central focus of the prejudice inquiry. The fact that a jury likely will convict Fierro if properly instructed is irrelevant under the prejudice analysis.

¶46 Additionally, the majority compounds its error by misconstruing the jury's rejection of Fierro's self-defense claim as an implicit finding of his intent to kill J.H. In other words, the majority seems to assert that the jury had a binary choice: (1) credit Fierro's self-defense theory and acquit or (2) find that he intended to kill the victim. *Supra* ¶ 25. This is a logical fallacy that the State seemingly recognizes in its

supplemental briefing. ("Of course, the fact the jurors rejected Fierro's self-defense claim does not in and of itself establish a lack of prejudice, but it is another relevant factor in the prejudice analysis . . . ."). Self-defense, as a justification defense, renders otherwise unlawful conduct permissible. *See* A.R.S. §§ 13-404(A), -205(A). As applicable here, Fierro would have been justified in using physical force against J.H. "when and to the extent a reasonable person would believe that physical force [was] immediately necessary to protect himself against [J.H.'s] use or attempted use of unlawful physical force." 13-404(A). Thus, contrary to the majority's assumption, the jury's rejection of Fierro's self-defense claim means only that the jury did not find Fierro's use of force justified in the first instance or in degree. It offers no other insight into the jury's determination of whether Fierro intended to kill J.H. As instructed, the jury could have rejected Fierro's self-defense claim and still convicted him of attempted second degree murder based on the erroneous theory that he intended to cause serious physical injury. Consequently, although the jury's rejection of Fierro's self-defense justification does not inform the prejudice analysis, it underscores that Fierro's intent to kill remained the sole issue for the jury to resolve.

¶47        We offer a final point on the confluence of a self-defense claim and an attempted second degree murder charge. The majority asserts that evidence and argument proffered to establish self-defense is immaterial to the jury's finding of intent to kill—the mens rea of attempted second degree murder. *Supra* ¶ 26. We disagree. The majority erroneously concludes that, because Fierro's subjective intent is immaterial to prove his self-defense claim, the jury may not consider such evidence to determine if the state proved his intent to kill. The majority offers no authority for the proposition that a jury, upon rejecting a defendant's claim of self-defense to attempted second degree murder, may not consider all relevant evidence and argument when determining a defendant's guilt. Fierro's subjective intent, expressed through his testimony, is certainly material to the jury's finding concerning his intent to kill.

¶48        Although the central issue on appeal is whether the record evidence placed Fierro's mental state at issue, the majority claims the defense "did not inject [his] mental state into the record at all," *supra* ¶ 39,

28

and gives the record short shrift.  The majority errs on both counts.  During his trial testimony, Fierro repeatedly asserted that he attacked J.H. and P.P. in self-defense.  For example, in response to a juror question concerning why he ceased his attack on J.H., Fierro responded, "[H]e had already passed, you know, had already passed.  I didn't see [J.H.] trying to hurt me anymore."  In context, Fierro's testimony is reasonably and fairly interpreted as meaning that he stopped attacking J.H. when he (J.H.) exited the trailer.  This contradicts the claim that Fierro intended to kill and squarely places his mental state at issue.  Similarly, in referring to either J.H. or P.P., Fierro testified that his motive and purpose for the assault was that he was "just trying to get him away from me."  This testimony, too, can be reasonably and fairly construed as an assertion that his intent was not to kill but rather to deter an attack.  Moreover, in closing argument, Fierro's counsel repeatedly invoked Fierro's mental state and, thus, his intent by emphasizing his claim that he merely acted in self-defense and "was just trying to get him away."  Critically, Fierro's counsel did not argue that his comment concerned P.P. rather than J.H.  A fair interpretation of this evidence and argument compels the conclusion that the defense squarely placed Fierro's mental state at issue in the case.

¶49    The majority also affords the prosecutor's consistent reliance on an intent to kill theory undue significance in the prejudice analysis.  Although it concedes that a prosecutor's statement of the law cannot correct a court's erroneous instruction, it cites *Dickinson* and *Bruggeman* for the proposition that "it can ameliorate it, such that it may be exceedingly difficult for the defense to prove prejudice," *supra* ¶ 33, and ultimately concludes that "[t]he State's unvarying theory of the case" effectively rendered the erroneous part of the second degree murder instruction inapplicable, *supra* ¶¶ 34–36.  Rather than bolster the majority's reliance on the ameliorative effect of a prosecutor's correct statement of the law, these cases refute it.

¶50    *Dickinson* offers the majority no cover.  At best, *Dickinson* supports the proposition that a prosecutor's correct recitation of the law is a *prerequisite* to refuting a defendant's claim of prejudice from a jury instruction's fundamental error, rather than possessing near absolute salutary force.  233 Ariz. at 533 ¶ 22; *see also Felix*, 237 Ariz. at 285 ¶ 18,

286 ¶ 20 (finding prejudicial error after rejecting the state's contention that its "vigorous pursuit" of a correct legal theory rendered the erroneous jury instruction immaterial). *State v. Bruggeman*, 161 Ariz. 508, 510 (App. 1989), is also distinguishable because the court's finding of no prejudice was based primarily on the unlikelihood that the instruction would mislead the jury rather than the curative effect of the prosecutor's correct statement of the law. *Id.* ("Although the last sentence of the instruction is not drafted as artfully as it should be, we find the error was not fatal when the sentence is read in the context of the whole instruction."). Notably, the majority fails to cite to a single case from this Court imbuing a prosecutor's statement of the law with such remedial import.

**¶51** In an attempt to support its conclusion that the erroneous instruction did not prejudice Fierro, the majority contends that the prosecutor's repeated admonitions that the jury must find intent to kill cued the jury that it should disregard the flawed instruction because another instruction stated "after you have deliberated and determined the facts you may then find that some instructions no longer apply." *Supra* ¶¶ 34–35. The majority offers no authority for what appears to be a rather unorthodox and ambitious application of this collateral instruction. On its face, the instruction invites jurors to disregard inapplicable instructions. But here, the entire attempted second degree murder instruction remained applicable and relevant to the case until the jury returned its verdict because the jury had to determine whether Fierro's conduct met one of the three theories for conviction (intent to kill, recklessness, or conduct that he knew would result in serious physical injury). The majority's reasoning impermissibly assumes that the jury never considered the flawed bases for conviction—that Fierro acted recklessly or knew that his conduct would cause serious physical harm. *Felix*, 237 Ariz. at 285 ¶ 17 ("In the absence of evidence in the record demonstrating that the jury failed to follow its instructions, we presume the jury did so here."). Moreover, the jury also was instructed that "what the lawyers say is not evidence" but may help them "understand the law and the evidence," which the majority ignores to avoid the paradox of relying on the prosecutor's statements which the jury was advised to take with a grain of salt. On this record, the majority's musings on the role of inapplicable instructions are, at best, speculative.

¶**52**     Endeavoring to shore up its finding of no prejudice, the majority offers a cursory recounting of *Dickinson* in an attempt to cast its reach over this case.  *Supra* ¶ 38.  But *Dickinson* refutes the majority's prejudice conclusion.  The majority correctly notes the similarities in these cases—similar erroneous jury instruction, the state's consistent theory was intent to kill, the state presented evidence disproving the primary defense, and the state argued that the defendant did not act in self-defense—but it conspicuously ignores the implications of the differences.  For example, critical to *Dickinson*'s finding of no prejudice was the defendant's defense of mistaken identity, which fell absolutely silent on intent, *Dickinson*, 233 Ariz. at 531 ¶ 15; testimony that the defendant "threatened the victim with an ax and told the victim he would kill him minutes before" twice driving over him with a truck, *id.* ¶¶ 4, 16; at no time did the defendant claim "that he was involved but did not intend to kill the victim," *id.* at 532 ¶ 18; and at no time did the defendant's counsel in closing implicate the defendant's mental state, *id.* ¶ 20.

¶**53**     Here, Fierro's defense was self-defense, which entailed his claim that he used reasonable force to defend himself and squarely injected his intent into the case, certainly through his testimony and counsel's argument; there was no testimonial evidence that Fierro intended to kill J.H. and, in fact, the State conceded that motive for the attack was elusive and that attempted second degree murder presented a "trickier question" (or as the majority interprets the phrase—"a more complex fact determination," *supra* ¶ 32); Fierro testified that he ceased his attack on J.H. inside the trailer when the threat from J.H. abated, indicating an absence of intent to kill; and Fierro's counsel, in closing, implicated Fierro's mental state when she repeatedly argued that he was merely defending himself, a clear implication that he did not intend to kill J.H.  *Dickinson* demonstrates the majority's error because its no prejudice finding is premised on the absence of precisely the evidence and argument presented here.  *Id.* at 533 ¶ 22 ("The [s]tate's theory was that Dickinson intended to kill the victim; Dickinson's defense was mistaken identity . . . . *Neither of these competing views suggests that Dickinson intended to cause serious injury to the victim (as opposed to kill him)*, which is the fundamental error in the jury instructions. Based on the particular facts of this case[,] . . . Dickinson failed to prove resulting prejudice." (emphasis added)).  Thus, *Dickinson* illustrates that the existence

of prejudice hinges not on the weight of the evidence of guilt, but on whether any evidence relied on by the defense implicated the erroneous jury instruction regarding the defendant's mental state at the time of the incident.

**¶54** The majority's effort to distinguish *Juarez-Orci* is equally unpersuasive. There, as here, the defendant was charged with attempted second degree murder for inflicting a wound to the victim's face and "several sizable wounds, including a wound to [the victim's] neck that could have been lethal had it been deeper." *Juarez-Orci*, 236 Ariz. at 526 ¶ 20. The victim also testified she believed the defendant "was going to kill [her]." *Id.* The majority contends the evidence that the defendant threatened to "beat up" the victim rather than kill her distinguishes this case because the erroneous instruction directly related to the defense. *Supra* ¶ 37. But here, as discussed, Fierro's testimony and his counsel's argument similarly placed his intent at issue. The majority's failure to recognize such evidence does not credibly wrest this case from *Juarez-Orci*'s rationale, and the jury's rejection of Fierro's primary self-defense theory does not preclude a finding of prejudice. *See, e.g., Felix*, 237 Ariz. at 286 ¶ 21 (noting that "[a]lthough defense counsel's primary argument was that Felix was not present and had an alibi, counsel also asserted in closing an alternative defense based on the mindset of the shooter," that he did not necessarily intend to kill).

**¶55** *Dickinson* and *Juarez-Orci* illustrate the proper prejudice analysis following fundamental instructional error. Unlike *State v. Escalante*, 245 Ariz. 135, 144 ¶ 34 (2018), which assessed prejudice arising from the erroneous admission of evidence and naturally emphasized "the amount of error-free evidence supporting a guilty verdict," an instructional error case, particularly one in which the state is relieved of its burden, centers on the impact of the erroneous instruction. Thus, although the evidence may be pertinent to the court's review of the entire record, the most important inquiry involves whether the flawed instruction implicated the defendant's theory and could have misled the jury. For that reason, despite overwhelming evidence of intent to kill in both *Dickinson* and *Juarez-Orci*, prejudice was established in *Juarez-Orci* because the defense

implicated the defendant's mental state but was not established in *Dickinson* because the defense was silent on intent.

**¶56** The majority misapplies our fundamental error prejudice analysis, overlooks or disregards critical evidence in the record, and strains our jurisprudence to reach an untenable finding of no prejudice. The inquiry under *Dickinson*, *Juarez-Orci*, and *Felix* is straightforward—did the defense present evidence and argument that placed Fierro's mental state at issue? If so, the erroneous attempted second degree murder instruction was prejudicial. The majority asserts that Fierro's defense was "unaffected by the faulty instruction" because "[t]he evidence did not show, and Fierro did not argue, that he intended to cause serious physical injury short of death." *Supra* ¶ 25. This misses the point and turns the prejudice analysis on its head. Fierro did not have to affirmatively present evidence that he intended to cause serious physical injury or otherwise invite the jury to convict on that theory to implicate the erroneous instruction, *he merely had to convey that he did not intend to kill*, which would have prompted the jury to consider the other erroneous grounds for an attempted second degree murder conviction. *Dickinson*, 233 Ariz. at 532 ¶ 18 ("Moreover, at no time did Dickinson claim that he was involved but did not intend to kill the victim *or* knew that his conduct would cause serious physical injury but not death." (emphasis added)). To that end, Fierro testified, and his counsel argued, that he merely acted in self-defense and that he ceased his attacks on J.H. and P.P. when he perceived an end to the threats. The gravamen of this testimony and argument is reasonably and fairly understood to mean that Fierro did not intend to kill the victims but rather intended to inflict physical injury until he perceived an end to the threats. This fact, alone, compels a finding of prejudice because the erroneous instruction necessarily implicated Fierro's defense. Viewed through the proper analytical lens, the strength of the State's case and the weakness of Fierro's self-defense claim assume marginal relevance because they do not concern whether Fierro's testimony and his counsel's argument implicated his mental state, nor do they foreclose a jury finding that Fierro did not intend to kill. In other words, to find an absence of prejudice, we must find—unlike here—that the instructional error involved an uncontested issue.

**¶57**      We note the majority's curious embrace of the State's argument that prejudice could not exist in this case because, even under the erroneous instruction, "[l]ogically, a jury could not find that the defendant took a step planned to culminate in second degree murder without intending the victim's death." *Supra* ¶ 29. If a "logical" juror reading this instruction "could not" have made a finding based on the erroneous intent standard, why have our courts, the State, and even the majority here so readily concluded the intent standard is erroneous and that the error is fundamental? In its attempt to bolster its no-prejudice conclusion using a no-fundamental-error argument, the majority rejects, in a cursory footnote, *Juarez-Orci*'s four-paragraph explication of the myriad reasons the instructions as a whole fail to mitigate risk of jury confusion based on the same erroneous instruction in this case. 236 Ariz. at 520 ¶¶ 13–16; *supra* ¶ 29. We depart with the majority's position because we find *Juarez-Orci*'s reasoning not just persuasive, but compelling.

**¶58**      Finally, the majority asserts that we have "effectively eschew[ed] our *Escalante* prejudice framework" and devised "a sort of 'super-fundamental error' standard that comes close to a per se rule that an erroneous jury instruction necessarily prejudices a defendant." *Supra* ¶ 22. We have done no such thing. To be clear, our analysis does not diminish *Escalante*; rather, it follows its framework and focuses on *this* instructional error as applied to *this* and similar cases. The majority seemingly pursues, under the guise of the *Escalante* framework, rarity in finding reversable error as an end unto itself. *Supra* ¶ 24. But rarity is an observation, not a legal doctrine. *Cf. State v. Valencia*, 241 Ariz. 206, 212 ¶ 30 (2016) (Bolick, J., concurring) ("We should treat the Court's forecast that irreparable corruption will not be found in the 'vast majority' of cases as speculative and dictum."). And although we agree that we rarely find reversible error, even with fundamental instructional error, our courts have routinely found reversible error when considering precisely the erroneous attempted second degree murder instruction at issue here. Indeed, in these circumstances, reversible error is the rule rather than the exception. And for good reason. Trial errors, including instructional errors, are not fungible. *Escalante*, 245 Ariz. at 144 ¶ 29 ("Establishing prejudice from fundamental error varies depending on the nature of the error and the unique case facts."). In fact, the *Escalante* framework expressly

contemplates and acknowledges that some errors are per se prejudicial. *Id.* at 140–41 ¶¶ 16, 20. Although we stop short of finding that the erroneous instruction here is always prejudicial (and we do not comment on other instructional errors as the majority erroneously asserts), allowing a jury to potentially convict a defendant on a non-existent legal theory for a crime that does not exist and that relieves the state of its burden to prove its case—and in particular, the *sole* contested issue at trial—is one of the gravest failings of our system. We disregard fundamental errors of this nature at our peril.

## II.

¶**59**     Despite the majority's misplaced confidence in the strength of the case and the jury's verdict, we are left to ponder the jury's report to the trial court during deliberations that it may have been deadlocked on a single unspecified count before returning guilty verdicts on all counts. *Id.* at 144 ¶ 32 ("Because that jury and a hypothetical 'reasonable jury' share the same presumptive traits, however, any questions posed by jurors during trial or deliberation may be pertinent in applying the standard objectively."). Could the jury have convicted Fierro for attempted second degree murder based upon a finding that his conduct was reckless or he knew it would cause "serious physical injury"? Of course. How could it not? After all, the jury received written and oral instruction to that effect, Fierro admitted that he inflicted serious physical injuries on J.H., and the verdict form on this count included the jury's express finding, albeit technically upon finding Fierro guilty of attempted second degree murder, that the offense "*involved the intentional or knowing infliction of serious physical injury*" on the victim. In other words, from beginning to end, the specter of an erroneous verdict permeated this case: the jury was instructed that it may convict Fierro based on serious physical injury and was even required to make such sentencing findings on this theory in its verdict form, which was available to the jury during its entire deliberations. The risk of an erroneous verdict comfortably exceeds the "metaphysical possibility" or "imaginative guesswork" discounted in *Escalante*. *Id.* at 142 ¶ 31; *supra* ¶ 21. Indeed, it is the majority's conclusion that rests on metaphysical possibility and is the product of imaginative guesswork. Here, as in *Felix*, in light of the erroneous instruction, without doubt "the jurors could have stopped deliberations after concluding that [the defendant] intended to

cause serious physical injury." 237 Ariz. at 287–88 ¶ 24. Thus, as the court of appeals determined in *Felix*, we "cannot conclude that no reasonable jury, properly instructed, could have declined to convict [the defendant] of attempted second degree murder." *Id.*

**¶60** Our justice system relies on our courts to serve as the guardians of our citizens' rights and custodians of the rule of law. Rather than endeavor to rationalize and minimize manifest fundamental error, as we fear we have done today, we must incentivize all parties in our criminal justice system to strive to do better, including to more carefully review jury instructions. To vindicate Fierro's right to a fair trial and to reduce the risk of such fundamental errors in the future, we would vacate the attempted second degree murder conviction and remand for a new trial—one in which we would not be left to speculate whether a conviction was predicated on a non-existent legal theory for a crime that our law has disavowed and a jury instruction which relieved the State of its burden to prove its case to a jury beyond a reasonable doubt.

# APPENDIX

