NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

STATE OF ARIZONA, *Appellee,*

*v.*

MARK DANIEL GOOCH, *Appellant.*

No. 1 CA-CR 22-0075
FILED 4-13-2023

---

Appeal from the Superior Court in Coconino County
No. S0300CR202000444
The Honorable Cathleen Brown Nichols, Judge

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael O'Toole
*Counsel for Appellee*

Coconino County Legal Defender's Office, Flagstaff
By Joseph A. Carver
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Cynthia J. Bailey delivered the decision of the Court, in which Judge Jennifer B. Campbell and Judge David D. Weinzweig joined.

---

**B A I L E Y**, Judge:

¶1 Mark Daniel Gooch appeals his convictions and sentences for first-degree murder, kidnapping, and misdemeanor theft. Because Gooch has shown no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2 Sarah[1] lived in a Mennonite community in Farmington, New Mexico. She shared a house with other women in the community, working in the church's publishing house and acting as a substitute Sunday school teacher. Sarah strictly adhered to the tenets of her Mennonite faith, consistently wearing a head covering to demonstrate modesty and obedience to God.

¶3 On the evening of January 18, 2020, Sarah drove to the nearby church to retrieve Sunday school materials. After several hours, Sarah's roommates noticed she had not returned home, and she was not answering her phone. When the women found Sarah's abandoned car in the church parking lot, they contacted their church leader and eventually reported her missing. When investigators arrived, they found Sarah's keys in her unlocked car and observed no signs of a struggle. A search for Sarah ensued, with investigators releasing a missing person bulletin on their social media account.

¶4 Over a month later, a camper discovered Sarah's body in the Coconino National Forest near Flagstaff, Arizona. When investigators arrived, they found Sarah lying face down, fully clothed with her hands bound in duct tape. Investigators never located Sarah's underwear or head covering. A medical examiner would later determine that Sarah suffered blunt force trauma and a single gunshot wound to the back of her head. The medical examiner located the bullet near the back of Sarah's jawline.

---

[1] We use a pseudonym to protect the victim's privacy. *See* Ariz. R. Crim. P. 31.10(f).

¶5         With no lead suspects, investigators reviewed data from the three cellular phone sites ("cell sites") positioned between Farmington and the location of Sarah's body on the relevant dates. The only phone that connected to all three cell sites belonged to Gooch. The data showed that Gooch traveled to Farmington near the Mennonite church, left around the time of Sarah's abduction, and stopped for over two hours near the location of her body. In comparing data from Sarah's phone, investigators found that she traveled the same route as Gooch until her phone stopped connecting to cell sites near the New Mexico/Arizona border. After leaving the area near Sarah's body, Gooch traveled back to a military base near Phoenix, Arizona. The data also revealed that, days later, Gooch returned to the location of Sarah's body before driving back to the military base.

¶6         Investigators learned that Gooch, an aircraft mechanic, lived at the military base in January and February 2020. Raised and educated in a Mennonite community, Gooch and his older brother, Samuel, refused to be baptized and eventually stopped participating in church services. Contrary to Mennonite doctrine, which requires pacifism, after Gooch received his GED, he joined the military. Those close to Gooch knew he harbored resentment for the Mennonite church.

¶7         In the week before Sarah's abduction, phone records revealed that Gooch spoke with Samuel about conducting "surveillance" of Mennonite communities in the area. He noted that surveillance of communities in the Phoenix area had been "another disappointment" and "taking risks [was] back at zero." Cell-site data from this day confirmed that Gooch visited multiple Mennonite communities in the Phoenix area. In a later conversation, Gooch and Samuel exchanged text messages with their brother. Their brother, a police officer, joked that he gave a Mennonite driver a ticket and he "coughed on him so he would spread Corona." Responding with excitement, Gooch said he found it "fucking hilarious" and hoped he "treated 'em like shit."

¶8         On the day of Sarah's abduction, video and gate entry data from the military base confirmed that Gooch left the base that morning and returned the following morning. When Gooch returned, video showed him carrying a plastic bag inside his residence and later discarding a similar-looking bag in a dumpster. As Sarah's abduction became public, phone records showed that Gooch repeatedly visited her missing person bulletin on social media.

¶9         Days after investigators located Sarah's body, Gooch had his car professionally detailed and paid extra for "complete interior" cleaning.

Gooch exchanged text messages with Samuel, who suggested that he have them spray down the car with disinfectant. The same day, Gooch bought a bottle of bleach from the military base commissary and asked if a co-worker could store his .22 caliber rifle. Gooch stored the rifle, along with .22-caliber ammunition, in the co-worker's safe. Gooch also submitted multiple requests to delete his location history in January and February 2020.

¶10        In an interview with the lead investigator, Gooch gave several inconsistent statements, ultimately claiming he traveled to Farmington to attend a church service because he knew members from that community. Investigators found no evidence Gooch knew anyone in that community or still attended Mennonite church services. He denied stopping anywhere near the Coconino National Forest on his return to the military base. The evidence contradicted much of law enforcement's data-driven timeline of Gooch's movements.

¶11        After Gooch's arrest, his co-worker provided the rifle and ammunition to investigators. A ballistics expert concluded that Gooch's rifle fired the bullet used to kill Sarah. Gooch's expert would later disagree, claiming an analysis yielded inconclusive results. Investigators searched Gooch's car, which was "exceptionally clean," and located a pair of binoculars and a box of nitrile gloves. They also learned that video from the Farmington Mennonite community on the day of Sarah's abduction captured what appeared to be Gooch's car. While in custody awaiting trial, Gooch contacted Samuel and asked him to remotely wipe his phone.

¶12        The State charged Gooch with one count each of first-degree murder, kidnapping, and misdemeanor theft, alleging alternate theories of premeditated and felony murder. During the twelve-day jury trial, Gooch moved for a judgment of acquittal under Arizona Rule of Criminal Procedure Rule 20 for the misdemeanor theft offense, arguing the State failed to show Sarah was wearing a head covering and underwear at the time of her abduction. The superior court denied the motion, finding the State presented sufficient circumstantial evidence of theft.

¶13        The jury found Gooch guilty of first-degree murder and kidnapping. Eleven jurors found both premeditated and felony murder, and one juror found only felony murder. At Gooch's request, the superior court rendered the verdict as to misdemeanor theft and found him guilty of the offense. The court sentenced Gooch to natural life for first-degree murder, a consecutive term of five years' imprisonment for kidnapping, and time-served for misdemeanor theft. Gooch timely appealed. We have jurisdiction under Article 6, Section 9, of the Arizona Constitution and

Arizona Revised Statutes ("A.R.S.") §§ 12-120.21(A)(1), 13-4031, and -4033(A)(1).

## DISCUSSION

### I. The Cumulative Effect of the Alleged Prosecutorial Error Did Not Render the Trial Unfair.

¶14 Gooch argues the cumulative effect of multiple alleged instances of prosecutorial error deprived him of his right to a fair trial. *See In re Martinez*, 248 Ariz. 458, 470, ¶ 47 (2020) (distinguishing between prosecutorial error and prosecutorial misconduct). Specifically, Gooch contends that the prosecutor improperly (1) emphasized a "stark moral contrast" between him and the victim; (2) commented on his veracity and vouched for the truth of the State's evidence; and (3) impugned the role of defense counsel in a criminal case. We assess each instance individually and, as here, review unobjected-to claims for fundamental error. *State v. Hulsey*, 243 Ariz. 367, 388, ¶ 88 (2018). We then determine whether the total impact of any errors we find rendered the trial unfair. *Id.*

¶15 In general, we give prosecutors wide latitude in rigorously cross-examining adverse witnesses, *State v. Holden*, 88 Ariz. 43, 54–55 (1960), providing impassioned remarks in closing argument, *State v. Gonzales*, 105 Ariz. 434, 437 (1970), and criticizing defense theories, *State v. Amaya–Ruiz*, 166 Ariz. 152, 171 (1990). While prosecutors may not vouch for the State's evidence, appeal to the jury's emotions, or impugn the integrity of opposing counsel, *State v. Acuna Valenzuela*, 245 Ariz. 197, 217–22, ¶¶ 75, 93, 109 (2018), they may present fair rebuttal to any areas "opened by the defense," *State v. Alvarez*, 145 Ariz. 370, 373 (1985). To determine whether a prosecutor's remarks are improper, we consider whether the remarks call to the jury's attention matters they would not be justified in considering, and the probability, under the circumstances, that the jury was influenced by the remarks. *State v. Jones*, 197 Ariz. 290, 305, ¶ 37 (2000) (citation omitted).

### A. Emphasis on "Moral Contrast" Between Gooch and Sarah

¶16 From the outset of trial, both the prosecutor and defense counsel referred to relevant tenets of the Mennonite faith. As early as opening statements, the prosecutor and defense counsel used Mennonite customs to present their theories of the case. The prosecutor used the Mennonite way of life to provide narrative context for Sarah's abduction, presenting Gooch's resentment for the church as a likely motive. In contrast, defense counsel stated that Gooch's values were rooted in his

upbringing in the Mennonite faith and the evidence would reveal him to be "a peaceful, nonviolent person."

¶17      Both sides examined these topics throughout the trial with permissible rationales. The prosecutor elicited testimony to explain why there was no sign of a struggle: Sarah's adherence to a doctrine of nonresistance. He also elicited testimony about customary dress under Mennonite teachings of modesty to show that Sarah was most likely wearing items that were taken by Gooch to support the theft charge. The prosecutor also elicited testimony about Mennonite doctrine to rebut defense counsel's inference that someone in the Mennonite community committed the offenses.

¶18      Defense counsel called Gooch's father to testify about his son's upbringing in the Mennonite faith and Gooch's exposure to its emphasis on pacifism, as evidence of Gooch's peaceful, nonviolent character. While Gooch's father conceded that his son ultimately refused baptism in the church, he testified that Gooch was raised to be nonviolent. When expressly asked about Gooch's "reputation for being a peaceful, nonviolent person," his father avowed that he never observed his son engage in violent behavior.

¶19      On direct examination, Gooch's father also testified that, in his opinion, Gooch "wasn't of a converted heart" and therefore did not feel a need to keep attending services. In cross-examination, the prosecutor asked Gooch's father to expand on the meaning of "a converted heart" and he responded that his son "had not yet turned from darkness to light."

¶20      Drawing on the metaphor of dark and light, the prosecutor began his closing argument: "Yesterday, I asked the defendant's father if the defendant had not yet turned from the darkness; he said correct. And in this case, the defendant did a lot of things in the darkness."

¶21      He argued that Gooch harbored "dark feelings" for the church and Sarah's adherence to Mennonite custom provided context for her abduction. In defense counsel's closing argument, he asserted that Gooch's "character matters," repeatedly claiming that the evidence proved "that he was a nonviolent person" and he did not hold a grudge against the Mennonite church. In rebuttal, the prosecutor addressed this claim, arguing the evidence showed Gooch rejected the "peaceful environment" he was raised in, and the principles of nonviolence held by his parents.

¶22      Even assuming the prosecutor's reference to Gooch's father's testimony was error, it does not rise to the level of reversible error. With

defense counsel placing Gooch's nonviolent character and Mennonite upbringing at issue, the prosecutor's use of evidence that he no longer held to tenets of nonviolence, rejected his upbringing, and committed violent acts constituted fair rebuttal. *See Alvarez*, 145 Ariz. at 373.

**¶23** To the extent that Gooch did not open the door to evidence of Sarah's adherence to the Mennonite faith, the prosecutor used this evidence to explain the nature of her abduction, her modest style of dress and head covering, and the improbability that someone from her community committed the offenses. *See* Ariz. R. Evid. 403 (relevancy test); *State v. Schurz*, 176 Ariz. 46, 52 (1993) ("[N]ot all harmful evidence is unfairly prejudicial. After all, evidence which is relevant and material will generally be adverse to the opponent.").

**¶24** That said, we caution prosecutors against remarking on the potentially "dark" or "evil" aspects of a case, especially in cases where irrelevant religious doctrine evidence is inadvertently introduced. *See State v. Robles*, 135 Ariz. 92, 94 (1983) (reversible error to call attention to irrelevant matters that probably affect the jury verdict). But a prosecutor's mere use of "excessive and emotional language is the bread and butter weapon of counsel's forensic arsenal" in closing argument. *See Gonzales*, 105 Ariz. at 437. When viewed in light of all testimony and evidence, including the brevity and obliqueness of the reference to Gooch's father's testimony, we do not find reversible error on this basis.

### B. Comment on Gooch's Veracity and Vouching for the State's Evidence

**¶25** During direct examination, the prosecutor asked the lead investigator to walk the jury through Gooch's interview and break down each time he provided an inconsistent or inaccurate fact. The prosecutor employed a pattern of describing what Gooch said, then asking what the evidence "actually" demonstrated. When asked if Gooch denied traveling back to the area near Sarah's body, the investigator responded that "he wasn't being truthful during that interview" because the evidence showed he returned to the area in February. In cross-examination, defense counsel highlighted consistencies in Gooch's statements and the investigator's use of misleading interviewing tactics. The prosecutor's closing argument underscored problems with Gooch's timeline, contending that the evidence "brought to light" the truth. Defense counsel countered that Gooch, who maintained a polite and cooperative demeanor in the interview, had been manipulated by the investigator's interviewing tactics.

¶26        We do not find these instances constituted prosecutorial error.  The prosecutor did not cross the line into improper vouching.  The prosecutor admitted Gooch's interview and, through the lead investigator, emphasized how the evidence already before the jury contradicted his timeline.  The prosecutor did not place the prestige of the government behind any witness or suggest that information not presented to the jury supported the desired verdict. *See Acuna Valenzuela*, 245 Ariz. at 217, ¶ 75.  While the prosecutor should not have suggested that the State's evidence revealed the truth, the jury could have reasonably concluded that the evidence conflicted with Gooch's evolving version of events.  Moreover, the prosecutor's emphasis on inaccuracies in Gooch's statements was relevant to establish consciousness of guilt. *See State v. Fulminante*, 193 Ariz. 485, 494, ¶ 27 (1999) (finding a defendant's "inconsistent statements to police" demonstrated "consciousness of guilt").

### C.  Comment on the Role of Defense Counsel

¶27        In closing argument, defense counsel asserted that Sarah's murder, while tragic, had been pinned on the "wrong guy."  Defense counsel highlighted the lack of any direct evidence, arguing "the State will emphasize their circumstantial evidence as they just did in great detail, and they will ignore the objective evidence that creates a reasonable doubt."  In rebuttal, the prosecutor argued that jurors cannot, as defense counsel urged, "look at one piece of evidence under a microscope and ignore everything else."  The prosecutor contended that it is defense counsel's "job" to "create some of the doubt in the case, possible doubt, and why they want to look at things under a microscope and not the entire picture," asserting that the prosecution provided them with the complete version of "what actually happened."

¶28        We do not find this instance constituted prosecutorial error.  We disagree with Gooch that the prosecutor's argument denigrated the entire institutional role of defense counsel in a criminal case.  Gooch's defense focused not only on his blanket denial, but the lack of any direct evidence linking him to Sarah's abduction and murder.  Defense counsel's primary strategy was to underscore the "absence" of a proverbial smoking gun.  The prosecutor's remarks merely criticized defense tactics, even if they suggested defense counsel's role is to obfuscate the truth. *See State v. Ramos*, 235 Ariz. 230, 238, ¶ 25 (App. 2014) ("Although some of the prosecutor's comments suggested that defense counsel was attempting to mislead the jury, we cannot say that those statements did more than criticize defense tactics.").  The prosecutor's criticism of such defense

strategies, even if impassioned, did not give rise to error. *See Gonzales*, 105 Ariz. at 437.

**¶29** We find no error by the prosecutor sufficient to rise to the level of having "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Hughes*, 193 Ariz. 72, 79, ¶ 26 (1998) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Further, the superior court properly instructed the jury more than once that questions, statements, and arguments made by counsel did not constitute evidence. The court also instructed the jury that their verdict "must not be influenced by sympathy or prejudice." Even if the prosecutor's lines of questioning and remarks were improper, we find that the court's "instructions negated their effect." *State v. Morris*, 215 Ariz. 324, 337, ¶ 55 (2007).

## II. The Prosecutor's Closing Remarks on Premeditation Did Not Result in Fundamental Error.

**¶30** Gooch contends that the prosecutor committed error by misstating the premeditation standard in closing argument. We review a single, unobjected-to misstatement of law to determine "(1) whether it constitutes prosecutorial error; (2) if so, whether the error was fundamental; and (3) if fundamental, whether the error was prejudicial." *State v. Murray*, 250 Ariz. 543, 549, ¶ 17 (2021).

**¶31** Although we afford wide latitude in closing argument, *State v. Goudeau*, 239 Ariz. 421, 466, ¶ 196 (2016), a prosecutor's "prerogative to argue their version of the evidence does not sanction a misstatement of law," *Murray*, 250 Ariz. at 549, ¶ 18. We consider "the context in which the statements were made as well as the entire record and to the totality of the circumstances." *State v. Nelson*, 229 Ariz. 180, 189, ¶ 39 (2012) (internal quotation marks and citation omitted).

**¶32** Relying on our findings in *State v. Malone*, 245 Ariz. 103 (App. 2018), *vacated on other grounds*, 247 Ariz. 29 (2019), Gooch argues the prosecutor impermissibly diluted the premeditation standard in closing argument. In *Malone*, the prosecutor argued that the defendant "[d]ecided to kill her, he killed her. That's it. That's premeditation. There's nothing more." *Id.* at 109, ¶ 27. We found this to be a "gross misstatement" of the premeditation standard, which required proof of both intent and reflection. *Id.* at 110, ¶ 28 (citing *State v. Thompson*, 204 Ariz. 471, 479, ¶ 32 (2003)). Because premeditation had been a central issue at trial, the misstatement of law could not be viewed as a "triviality." *Id.* We concluded, however, that

the prosecutor's misstatement of law did not amount to fundamental error. *Id.* ¶ 30. Any error had been cured by the superior court's correct jury instruction on premeditation, and the prosecutor's clarification that premeditation requires reflection in another portion of closing argument. *Id.* ¶¶ 29–30.

**¶33** Here, the prosecutor's closing remarks focused heavily on evidence that Gooch conducted surveillance of Mennonite communities, harbored resentment for the church, waited to abduct Sarah, bound her wrists, and drove a long distance to commit and conceal the murder. The prosecutor noted, in rebuttal, that there was no "dispute" as to premeditation because Gooch's defense involved a blanket denial. Without objection, the prosecutor then argued that premeditation does not require the defendant have "some plan written down on a napkin somewhere or that he has some kind of plan to kill [Sarah], in particular. What we do know is that the defendant abducted her from her community and took her to a faraway location, a remote location of his choosing, where he killed her. And that's premeditated murder; shooting somebody in the back of the head with intent is premeditated murder." In the final jury instructions, the superior court instructed the jury that premeditation required proof that Gooch intended to kill Sarah and he "reflected on the decision before killing" her.

**¶34** While we agree with Gooch, the prosecutor seemed to conflate intent with reflection, he did not simply argue the decision to kill proved premeditation. The prosecutor focused on the prolonged series of events, including the time Gooch took to surveil, abduct, and subdue his murder victim. In this context, the prosecutor's closing remarks did not dilute or grossly misstate the standard by arguing the final cause of death, a gunshot wound to the back of the head, demonstrated premeditation. The prosecutor's characterization of the evidence and law, taken together with the superior court's accurate jury instruction, remedied any potential error. *See State v. Patterson*, 230 Ariz. 270, 276, ¶ 25 (App. 2012) (finding prosecutor's initial misstatement of the law cured by clarification and accurate jury instructions). Moreover, Gooch's defense did not rest on whether the evidence established both intent and reflection, but on total innocence. The prosecutor's brief discussion of premeditation did not prejudice Gooch ability to present his chosen defense or prevent him from receiving a fair trial. *See State v. Gomez*, 211 Ariz. 494, 500, ¶ 27 (2005) (finding erroneous jury instruction on premeditation did not "take away a right essential to the defense" when "defense was of total innocence").

¶35         Gooch further contends that, absent the alleged error, the jury would not have returned eleven votes for premeditation, a fact he argues influenced the superior court's sentencing decision.  We find nothing in the record to support this claim.  The jury reached a unanimous verdict as to felony murder, giving the court authority to impose either natural life or life with the possibility of release.  *See* A.R.S. § 13-751(A)(3). Although the State asked the court to consider the eleven votes for premeditation, the court did not adopt this rationale at sentencing.  In imposing a natural life sentence, the court referenced only the statutorily enumerated aggravated factors, stressing the significant harm to the victim and her family.  *See* A.R.S. §§ 13-701(D), -752(Q).  The court did not consider improper factors in reaching its sentencing decision.

**III.    The Superior Court Had Subject Matter Jurisdiction to Convict and Sentence Gooch for Misdemeanor Theft.**

¶36         Gooch argues that the superior court lacked subject matter jurisdiction over the misdemeanor theft offense because the State failed to introduce evidence that it occurred in Arizona.  A defect in subject matter jurisdiction is never waived and may be raised at any time.  *Bruce v. State*, 126 Ariz. 271, 272 (1980).  We review challenges to the court's subject matter jurisdiction de novo.  *Lay v. Nelson*, 246 Ariz. 173, 175, ¶ 8 (App. 2019).

¶37         A court must have subject matter jurisdiction over a criminal offense to render a valid judgment and sentence.  *Peterson v. Jacobson*, 2 Ariz. App. 593, 595 (1966).  As set forth in A.R.S. § 13-108(A)(1), subject matter jurisdiction is established if the "[c]onduct constituting any element of the offense or a result of such conduct occurs within this state."   The legislature's "enactment of A.R.S. § 13-108(A)(1) is an expression of intent to exercise jurisdiction over a crime, wherever committed, when the 'effect' or 'result' of such crime occurs in Arizona."  *State v. Flores*, 218 Ariz. 407, 414, ¶ 17 (App. 2008).  Interpreting the language of A.R.S. § 13-108(A)(1) broadly, we have concluded that courts retain jurisdiction over an offense "committed in another state if the result of such criminal activity has a substantial effect within Arizona," even if the "result" or "effect" is not an element of the offense.  *State v. Yegan*, 223 Ariz. 213, 215–16, ¶¶ 8–10 (App. 2009).

¶38         As relevant here, a person commits theft if, without lawful authority, he knowingly "[c]ontrols property of another with the intent to deprive the other person of such property." A.R.S. § 13-1802(A)(1).  At trial, the evidence established that Sarah never left the house without her head covering, and a witness observed her wearing it the day preceding her

abduction. Gooch drove Sarah over the Arizona border, killed her, and left her body in the Coconino National Forest. Later that day, video footage captured Gooch throwing out a plastic bag. When investigators found Sarah's body, she was fully clothed with her hair still pulled into a tight bun and hair net. The only clothing items missing were her underwear and head covering.

**¶39**      Though largely circumstantial, sufficient evidence supported the jury's finding that Gooch knowingly controlled Sarah's property with the intent to deprive her of that property. *See* A.R.S. § 13-1801(A) (defining "control" and "deprive"); *State v. Denson*, 241 Ariz. 6, 10, ¶ 17 (App. 2016) ("Evidence sufficient to support a conviction can be direct or circumstantial."). It is irrelevant to the question of subject matter jurisdiction if Gooch removed the items from Sarah or developed the intent to deprive her of the items while still in New Mexico. Gooch discarded Sarah's body and permanently deprived her of the items in Arizona. Thus, the taking of the property, the "intended consequence of his crime," occurred within Arizona and subjected him to this state's jurisdiction. *See Yegan*, 223 Ariz. at 217, ¶ 12. The superior court properly exercised its jurisdiction over Gooch's misdemeanor theft offense.

**CONCLUSION**

**¶40**      For the foregoing reasons, we affirm Gooch's convictions and resulting sentences.

